NASHVILLE, C. & ST. L. RY. v. SUTTON, etc.—104 S. W. (2d) 834.

Middle Section. July 25, 1936.

Rehearing denied January 2, 1937.

Petition for Certiorari denied by Supreme Court, May 1, 1937.

Wm. H. Swiggart, of Nashville, for plaintiff in error railway.

J. Roy Hickerson, of Winchester, for defendant in error administrator.

FAW, P. J. Shortly before daylight on the morning of July 24, 1935, the dead body of Jim Sutton was found on the track of the Nashville, Chattanooga & St. Louis Railway, between the stations of Anderson and Sherwood in Franklin county, Tenn. Before and at the time of his death, Jim Sutton was a resident of Franklin county, and his brother, Ulis Sutton, was appointed and qualified as administrator of his estate, and on August, 3, 1935, as such administrator, instituted an action against the Nashville, Chattanooga & St. Louis Railway, in the Circuit Court of Franklin County, for $30,000 as damages, averring, in the second count of his declaration, that plaintiff's intestate, while walking along the railroad of the defendant, which was customarily used by the deceased as a walkway to his home, was struck by one of defendant's trains and was then and there horribly mangled. wounded, and bruised on the head, back. limbs, and internally, from which wounds and bruises he suffered great physical pain and mental anguish and languished and died; that defendant did not, at the time and place aforesaid, have the engineer, fireman, or some other person upon the locomotive on the lookout ahead as required by law, and did not, when plaintiff's intestate appeared upon the track or within striking distance of said train, sound the alarm whistle, put down the brakes. and employ every possible means to stop the train and prevent the accident; that plaintiff's intestate appeared upon the track of the defendant and became an obstruction thereon at the time and place aforesaid; and that defendant's failure to comply with the statute in such cases made and provided was the proximate cause of the accident and injuries and death of plaintiff's intestate.

It is seen that plaintiff's action is predicated upon an alleged failure of the defendant to comply with the "statutory precautions" prescribed by subsection 4 of section 2628 of the Code.

It is averred in the declaration and shown by the proof that the deceased, Jim Sutton, left surviving him a widow and nine children. for whose use and benefit the suit was brought. Plaintiff's declaration contained two counts. but the first count, through which plaintiff sought to charge the defendant with common law negligence, was eliminated from consideration by appropriate action

of the trial court, and no question of the propriety of that action is made in this court.

Upon the issues made by defendant's plea of not guilty, the case was tried to a jury, and the jury found the issues in favor of the plaintiff and assessed his damages at $2,000. A motion for a new trial on behalf of defendant was overruled by the trial judge, and thereupon the defendant reserved exceptions to the action of the court in overruling its motion for a new trial and appealed in error to this court.

Referring to the parties as plaintiff and defendant as they appeared on the record below:

At the conclusion of the plaintiff's evidence, the defendant moved the court to peremptorily direct the jury to return a verdict for defendant, on the ground (as stated at the time by defendant's attorney) "that there is in the entire record no competent, material and relevant proof upon which a verdict could be based; and particularly is there no proof to show that the decedent appeared as an obstruction upon the track prior to his death."

The aforesaid motion was overruled, but it was renewed at the close of all the evidence, when it was again overruled.

Through its assignments of error in this court, the defendant asserts that there is no evidence to support the verdict, and that the circuit court erred in overruling its motion for a directed verdict made at the close of all the evidence.

It is contended for defendant that "the record contains no evidence to support an inference or finding of fact that the deceased appeared as an obstruction in front of and within striking distance of any of its trains; and that the verdict is the result of surmise, guess or speculation upon the part of the Jury, wholly unsupported by evidence."

It is further insisted for defendant, "as an alternative position," that "any possible probative value of the circumstances developed in the evidence. as making a prima facie case of liability, is entirely destroyed by affirmative testimony of the operators and inspectors of the trains involved. that no obstruction appeared on the track at or near the place where Sutton's body was found."

On the other hand, it is insisted for plaintiff that, although (so far as the record shows) "no one saw defendant's train kill plaintiff's decedent." the evidence discloses circumstances from which the jury could reasonably and properly find that plaintiff's intestate appeared as an obstruction on defendant's railroad track; that defendant failed to observe the statutory precautions when deceased thus appeared as an obstruction on its track; and that plaintiff's intestate was then and there struck by one of defendant's locomotives and killed in the manner described in plaintiff's declaration.

It becomes our duty to ascertain whether there is material and substantial evidence of facts from which the jury could reasonably draw inferences supporting the finding of the issues in favor of the plaintiff. In making this inquiry it must be borne in mind that an inference cannot be drawn from another inference, and that the verdict cannot be sustained unless the facts in evidence afford a basis for no reasonable inference other than one consistent with the verdict.

The dead and mangled body of plaintiff's intestate, Jim Sutton (who, for convenience, we will sometimes refer to as Sutton), was found on defendant's track at 3:45 a. m. on July 24, 1935, at a point between the stations of Anderson and Sherwood and about 1,789 feet north of the defendant's depot at Anderson. Sherwood is approximately six miles north of Anderson. Sutton was forty-eight years of age at the time of his death. He was much given to the habit of drinking intoxicating liquors. About 4:30 o'clock in the afternoon of July 23, 1935, he appeared at Arms Spring, in the vicinity of the station at Anderson, with a fruit jar one-half full of "regular old mule whisky," where he and Arms drank one-half of the whisky, and two or three other men who arrived later helped them consume the remainder. One of the men who drank with Sutton on that occasion testified at the trial that Sutton was "not drunk."

After remaining at Arms Spring for a half hour or a little more on the occasion above mentioned, Sutton and the witness Henry Bradford left there together and walked north on the railroad track from Anderson Depot, passing the place where Sutton's body was later found, to a private road crossing over the railroad track, known as Pittmen's Crossing, approximately 1,950 feet north of Anderson Depot, where they walked west and southwest along Pittman's private road for approximately 300 feet to a gate near Pittman's house, which opened into a public road, described in the record as an "unimproved wagon road."

Just inside the gate above mentioned, Sutton "laid down," saying that "he wanted to rest a minute," but he remained there only five or ten minutes, for the reason that Mrs. Pittman "asked them to get up and leave from in front of the house." From Pittman's gate Sutton and Bradford walked in a southerly direction about 500 feet, following the public road a part of the way (approximately 100 feet) and a footpath the remainder of the distance, to the junction of two paths, one of which (known in the record as the "Sutton path") led westward up the mountain side, to Sutton's home, and the other (known in the record as the "Bradford path") led southward "around the mountain" to Bradford's home.

At the junction of the Sutton path and the Bradford path, Sutton

"said he was kind of sick and wanted to rest a few minutes" and sat down, and Bradford left him sitting there and went on homeward and (according to Bradford's testimony) saw Sutton no more.

Jesse Curtis lived on the mountain beyond Sutton's home (from the railroad track) and, while on his way to his home "between sundown and dark" on July 23d, saw Sutton sitting at the junction of the Sutton path and Bradford path, which was the same place where Bradford had left Sutton a little while before. Curtis testified that Sutton asked him to carry a pair of shoes to his (Sutton's) wife, and that he did so. Curtis stated that Sutton did not "have any appearance of being drunk," but "said he was sick and would be on directly."

The above-mentioned witnesses Henry Bradford, Mrs. Pittman, and Jesse Curtis, are the only witnesses in the record who saw Sutton alive after he left Arms Spring about 5 p. m. on July 23d.

On the day Sutton's body was found (July 24th), a hat, identified without dispute as Sutton's hat, was found at or very near the place where Bradford and Curtis had left Sutton sitting the preceding evening.

The witnesses Carl Willis, Mrs. Carl Willis, and Forrest Pittman heard "hollering" about 8 o'clock in the evening in question, and Mr. and Mrs. Willis heard a second "hollering" about an hour later. Mr. and Mrs. Willis lived in a railroad section house west of and near the railroad, about 500 or 600 feet southeast of the junction of the Sutton and Bradford paths, where Sutton was last seen alive by the witnesses, and Pittman lived about 900 or 1,000 feet north of said junction. Mr. and Mrs. Willis said the "hollering" was north of their home and in the direction of Pittman's home, and Pittman said it was south of his home and on the side of the mountain. Mrs. Willis said it was not "loud hollering," and that she at the time she heard the "hollering" heard some one say, "Hey Barney." It appears that Sutton's nickname was "Barney."

No witness in the record saw Sutton, either alive or dead, until 3:45 o'clock on the following morning, July 24th, when his body was found on the railroad track by the witness Walter Crownover, from whose testimony we quote as follows:

"Q. Mr. Crownover, you live over at Anderson, don't you? A. Yes, sir.

"Q. Do you remember the occasion when Jim Sutton was killed over there? A. Yes, sir.·

"Q. You saw the dead man, found him? A. Well, I suppose I was, if anybody else had seen him they had not reported it, I don't suppose.

"Q. What time in the morning was it, or what time was it when you found him, Mr. Crownover? A. Well, sir, when I left my house it was twenty-one minutes of four.

"Q. How far did you live from where you found him? A. I live about 350 yards.

"Q. So, it was about a quarter of four when you found him? A. Yes, sir.

"Q. Something like that? A. Yes, exactly that by Mr. Pittman's watch.

"Q. By Mr. Pittman's watch? A. Yes, he come down and I asked him what time it was when I called him.

"Q. Mr. Pittman lives just above there a short distance? A. Yes, sir.

"Q. The nearest house? A. Yes, sir; the nearest house.

"Q. Where was the body lying when you saw him? A. It was lying next the west rail in the center of the track, next the west rail, with its face south, or head south, lying on his back.

"Q. You called then Forrest Pittman, then some other neighbors close by to see about getting the body up? A. Yes, sir.

"Q. Did you examine the body at the time you first saw it there, or just see it and immediately call? A. When I struck the match to see, I could see the bulk of it shining on something and about the time I got to the crossing.

"Q. How far is that from the body? A. It must be that was five rail lengths since I have examined it since, by going up there. I don't know exactly now, right in the center of the track where it was at, but something like that.

"Q. That is about 150 feet, that is thirty feet to the rail? A. Thirty-three, I think.

"Q. All right, about 165 feet. A. The way it was with me, I seen something white in the track, I thought it was a big piece of paper, probably. I went on, it was getting tolerably light and I walked on. When I got to it it was a little too dark for me to just exactly tell what it was. I thought it was not a paper, nothing like that. I thought it was a dead calf, or cow or something and I struck a match. I struck a match and seen it was a man, and I turned to holler to Mr. Pittman who lives at the nearest place. I decided, 'No, I might be mistaken,' and turned around and struck another match to be certain before I hollered. Just in a second I seen a man's face, and I turned around and hollered to Mr. Pittman. I called him, I think twice, and he answered. I told him, 'Come on down, I have found a dead man in the track.' He rushed on down there and we examined him again. There was a train coming, but we did not have no light to flag it. I asked him if he knew the man. He said, 'no,' I said, 'It is just somebody who has been riding the trains and fell off here, probably we had better go wake up the section foreman and let them take charge of him; he is on their right-of-way.' We made a break to go to the section foreman, me and him together.

We decided the train might pick him up and knock him all over us. We made a run, him and me to the tool house and got behind there.''

(At this juncture the jury retired upon request of defendant's attorney, and in the absence of the jury, the court ruled that it would not be competent to show that trains passed over the body of the deceased after he was found dead on the track. The jury thereupon returned and the examination of witness Walter Crownover was resumed.)

''Q. (Mr. Hickerson) Mr. Crownover, did you observe the body there, as to whether there was any blood or anything like that around it, or about it? A. Well, sir, the best I looked, noticed, it looked to me like it was pretty dry. I did not see any fresh blood at all.

''Q. What about the intestine? A. They were hanging out on the ground behind him.

''Q. How did they look? A. They looked dry, looked like it had been done possibly several hours.

''Q. Was the body stiff, or could you tell? A. I didn't touch it. I don't know.

''Q. You did not touch it? A. No, sir.''

Forrest Pittman (witness for defendant) corroborated the testimony of Walter Crownover, that the latter called him (Pittman) after he saw the dead body of Sutton on the railroad track at the time and place stated by Walter Crownover.

Other witnesses who saw the body of Sutton before it was moved from the place where Walter Crownover found it, as aforesaid, were George Crownover, Harvey Curtis, and Will Curtis, all of whom were introduced as witnesses on behalf of the plaintiff.

George Crownover, while on his way to work, ''just before day,'' saw Sutton's body on the track, and his testimony as to its location and condition is, as far as it goes, in substantial accord with that of Walter Crownover above stated, but much more brief.

Will Curtis and Harvey Curtis were railroad section hands and lived in section houses near the railroad track north of Anderson depot and approximately midway between Anderson depot and the point where the body of Sutton was found. They were called about 4 o'clock a. m. on July 24th, and, pursuant to instructions of their section foreman, removed the remains of Sutton to the Anderson depot, where they were later taken in charge by R. L. Sims, an undertaker, who (in reply to a question as to what condition he found the corpse in) testified at the trial, as follows:

''A. Well, it was one of the worst mutilated bodies I think I ever cared for. His left arm was off the body near the shoulder and both limbs were mangled, just wound up with his intestines, the body had been cut almost in half, his intestines were all exposed and his limbs were broken up, the bones, in fact some six or eight inches in

length and his intestines, limbs were all wound back, and nothing was intact except the upper part of the thoracic part of the body, the head and shoulders. Of course, the arm was not mutilated, that was cut off the body.''

In their testimony, Will Curtis and Harvey Curtis, respectively, testified to certain observations made by them along the railroad track south of the point where the body of Sutton was found. With reference to his observations, we quote from the testimony of Will Curtis as follows:

"Q. Going from Anderson up to the scene of the accident, what was the first thing you saw to attract your attention? A. Well, first his shoes were found, found lying in the track, before we got to him, you know.

"Q. Both shoes lying in the track? A. Yes, sir; both shoes were lying in the track.

"Q. State whether or not you found any vomit? A. Well, it was something like vomit, I would not say for sure, but it just looked like it.

"Q. That is what you thought it was? A. Yes, sir.

"Q. Now, was that the first thing that you saw going down from Anderson toward the scene of the accident, that first disturbance? A. Yes, the shoes was the first we found.

"Q. Yes, where the shoes were found? A. Yes, sir.

"Q. Now, from this vomiting place, what did you next see? A. Well, just looked like where he had been scooped up, you see, the rocks, hit there and scooped up again.

"Q. Scooped up the rocks? A. Yes, knocked up on the ties.

"Q. What direction was that from where you saw the vomit? A. North, coming toward Sherwood.

"Q. You say the scooped up place knocked the rock ballast all over the ties, toward Sherwood? A. Yes, sir.

"Q. Then, from that you saw different things on up the track? A. Yes, sir.

"Q. Did you see that bone sticking in the rail, I mean the tie? A. Yes, sir.

"Q. Which side of the tie was it sticking in, toward Sherwood or toward Anderson? A. Yes, toward Anderson.

"Q. About what portion of the tie? A. About middle-ways, I think.

"Q. Middleways of the rail? A. Yes, sir.

"Q. Now, you went on down then and found the body, did you? A. Yes, sir.

"Q. Where was it lying? A. Lying over to the left of the rail as you go toward Sherwood, nearly right up against it.

"Q. Between the ties? A. Yes, sir; the rails.

"Q. I mean the rails? A. Yes, sir.
"Q. Which way was the head turned? A. Toward the south.
"Q. South? A. Yes, sir.
"Q. That is about 150 feet from Forrest Pittman's crossing, something like that? A. About something like that, I think, yes."

In his testimony, Harvey Curtis said nothing (and was not asked) about seeing the shoes of deceased on the railroad track, and he mentions one fact not stated by Will Curtis, viz., that the right arm of the deceased was lying on the outside of the east rail about "a rail (33 feet) back south from his body;" otherwise the testimony of Harvey Curtis is substantially the same as that of Will Curtis, supra.

Ulis Sutton (the plaintiff administrator) lived about two and one-half miles from Anderson. He learned of the death of his brother, Jim, about 7 o'clock a. m. on July 24th, and went immediately to Anderson and to the place where the body had been found.

Nath Lynch, a deputy sheriff of Franklin county, was called at Sherwood about 7:30 or 8 o'clock on the morning of July 24th and went to Anderson, and made observations on and along the railroad track northward from Anderson to the point where the body had been found.

It appears from the testimony of the last-mentioned two witnesses that they saw "vomit" at a point which Lynch says was three and one-half rail lengths (approximately 115 feet) south of the place where the body was found. Ulis Sutton says this "vomit" was "between the ties on the outside of the west rail," and Lynch says it was "on the outside and inside of the rail," and (as indicating that it was "human vomit") Ulis Sutton says that it contained meat, potatoes, and tomato hulls, and Lynch says that it contained "chunks of meat." Lynch also stated that the "vomit" was "practically dry."

All of the witnesses in the record, who examined the railroad track at and south of the place where the body was found, saw the vomit, and further testified that a short distance (Lynch says 15 feet) north of the "vomit" the "ballast," or "gravel," was "scooped out," or "torn up," in the middle of the track, between two ties, and scattered over four or five ties northward; that, a few feet north of the "scooped out" place above mentioned, there was a piece of bone sticking in the south side of the tie about midway between the rails, which bone (Lynch says) was between one-fourth and one-half of an inch wide, and (Will Curtis says) "looked like a rib bone."

Ulis Sutton said the bone was about "as big as your thumb" and had "a little flesh and blood" on it that "looked to be pretty fresh." Will Curtis (also plaintiff's witness) said the bone had no flesh on it and he did not notice any blood on it. Nath Lynch said that the bone "looked fresh" because it "looked white," and "it looked like

it was freshly driven," in but that it was "dry," and that he "took hold of it and tried to pull it out and could not."

Ulis Sutton was asked if (in addition to the indicia hereinbefore mentioned) he saw "any other disturbance on the track," and he replied: "Nothing only just flesh and bones and clothing, socks, one of his socks, and supporters lying there torn off."

Will Curtis, a witness for plaintiff, who lived at Anderson, and who made some observations at some indefinite time after the body of Sutton had been removed from the track, testified that he saw on the track "a little blood, a piece or two of flesh," and "a piece of clothing, one of his socks."

Nath Lynch picked up a finger "just outside of the west rail" . . . "about half way between where the body was picked up and where he was hit at." (We infer from the testimony of Lynch that he was assuming that the deceased was "hit" at the place where witness saw the vomit.)

Aside from the vomit and the finger found just outside the west rail, and the arm found outside the east rail (all as hereinbefore described), there were no claimed indicia of injuries to Sutton on or near the railroad track except between the rails.

The body of Sutton was found on a section of straight railroad track. The track was straight from that point southward for approximately 1,000 feet, and northward for a mile or more.

At the trial below, a written stipulation was read into the record by plaintiff's attorney, as follows:

"The following trains owned and operated by the defendant, the Nashville, Chattanooga & St. Louis Railway, passed over the main line of Defendant's railroad track between Sherwood, Tennessee and Stevenson, Alabama, at the times indicated below between 5:00 o'clock P. M., on the afternoon or night of July 23, 1935 and 6:00 o'clock A. M., on the morning of July 24, 1935.

"All of said trains passed through Anderson, Tennessee on the main line of defendant's railroad, and none of them stopped at Anderson, Tennessee.

"This was all of said trains going south:

"Train No. 53, left Sherwood at 5:34 in the afternoon of July 23rd, and left Stevenson, at 5:59 on that afternoon.

"Train No. 51 left Sherwood at 11:27 at night, July 23rd; left Stevenson at 11:57 that night.

"Train No. 47 left Sherwood at 12:15 on the morning of July 24th, just after midnight, and left Stevenson at 12:38 on the morning of July 24th, just after midnight.

"Train No. 3 left Sherwood at 12:46 on the morning of July 24th, that is just after midnight, and left Stevenson at 1:04 at night on the morning of July 24th.

"Train No. 93 left Sherwood at 3:49 on the morning of July 24th and left Stevenson at 4:06 on the morning of July 24th.

"Train No. 45 left Sherwood at 5:15 on the morning of July 24th, and left Stevenson at 5:32 on the morning of July 24th.

"The following trains owned and operated by the defendant, Nashville, Chattanooga & St. Louis Railway passed over the main line of defendant's railroad tracks between Stevenson, Alabama, and Sherwood, Tennessee, at the times indicated below between 7:00 o'clock P. M., on the night of July 23rd, 1935, and 4:00 o'clock A. M., on the morning of July 24, 1935. This was all the trains which passed through Anderson, Tennessee, on the main line of defendant's railroad, and all of the them were going north:

"Train No. 50 left Stevenson at 8:03 at night, 8:00 o'clock at night, July 23rd, and left Sherwood at 8:21 that night.

"Train No. 54 left Stevenson at 8:49 on the night of July 23rd, and left Sherwood at 9:14 on the night of July 23rd.

"Train No. 44 left Stevenson at 9:50 on the afternoon of,—on the night of July 23rd, and left Sherwood at 10:30 on the night of July 23rd.

"Train No. 92 left Stevenson at 11:02 on the night of July 23rd, and left Sherwood at 11:26 on the night of July 23rd.

"Train No. 4 left Stevenson at 3:00 o'clock on the morning of July 24th, and left Sherwood at 3:35 on the morning of July 24th.

"None of these trains listed in this stipulation stopped at Anderson, Tennessee on the night of July 23rd, except Train No. 92. Train No. 92 listed above stopped at the station in Anderson, Tennessee on the main line for about five minutes, and then continued its run going north."

The record does not show the distance between Stevenson and Sherwood, but, as stated in the brief for defendant, "reference to maps in common use will show it to be about 17 miles." It is seen from the foregoing stipulation that five northbound trains and three southbound trains passed the point where Sutton's body was found, between 6:00 o'clock p. m. on July 23rd, and 3:45 a. m. on July 24th.

It is an obvious inference from the record facts that the body of Sutton, either dead or alive, was dragged northward along the railroad track by one of defendant's trains, and, as a result, was mangled and mutilated. It is also a reasonable inference from the condition of Sutton's body when found at 3:45 o'clock a. m. on July 24th, that he had been dead and mangled and mutilated for a period of several hours theretofore.

But is there any substantial evidence—evidence "having fitness to induce conviction"—in the record upon which the jury could reasonably base a finding that Sutton appeared, as an obstruction, upon the track in front of the train, and was, in that manner, struck by the train and killed?

The defendant introduced the testimony of the engineers and firemen of each of the several trains mentioned in the foregoing stipulation, and each of them testified (with reference to the time and place in question) that his engine and train was in good running order and the headlight on the engine was burning brightly; that he was on the lookout ahead and could see clearly the tracks ahead; and that no obstruction appeared on the track, or within striking distance of the train, between Sherwood and Anderson, or elsewhere, on that night.

The defendant also introduced the testimony of its engine inspectors that all of the engines in question were inspected on the morning of July 24th—the northbound engines at the shops in Nashville, and the southbound engines at Chattanooga—and the testimony of these inspectors is, in substance, that they made a careful inspection of all parts of these engines (in front and underneath) that would have come in contact with a man if the engine had hit him, and they found no blood nor anything of any kind that indicated that a man had been in contact with the engine. These inspectors had information early on the morning of July 24th that a man had been found dead on the track near Anderson, and they were instructed to make a careful inspection, and they testified that they did so.

On motion of defendant for peremptory instructions, it is the duty of the court to take into consideration evidence introduced by the defendant supporting its contentions, in so far as such evidence is not in conflict with the evidence of the plaintiff; but to disregard all of the defendant's evidence that is contradicted by or inconsistent with the evidence favorable to the plaintiff. Martin v. Braid Electric Co., 9 Tenn. App. 542, 558; Nashville Gas & Heating Co. v. Phillips, 17 Tenn. App. 648, 651, 69 S. W. (2d) 914.

The testimony of a witness who is not contradicted, impeached, or discredited, must be accepted as true, and his testimony cannot be discredited or disregarded arbitrarily and capriciously. Frank v. Wright, 140 Tenn. 535, 541, 543, 205 S. W. 434.

If there is any material evidence in the record reasonably tending to show that plaintiff's intestate was struck and killed by defendant's train while he was an obstruction on the track in front of the train, the testimony of defendant's trainmen and inspectors, above mentioned, must be disregarded; but if there is no such evidence supporting plaintiff's cause of action, the testimony of said trainmen and inspectors must be accepted as true, for, if not contradicted, they are not impeached or discredited in the record by any of the methods recognized by law.

The record affords no suggestion of an explanation of the return of the deceased to the railroad track after he traveled over his usual route along the railroad track, passing the place where his body was later found, to Pittman's crossing and thence to the junction of

the Bradford path with the path leading to his (Sutton's) home, where Bradford and Jesse Curtis left him. He told Jesse Curtis that he would go on home "directly." His only practical route to reach the railroad track from the point where Jesse Curtis left him was to retrace his steps to the Pittman crossing. However, according to the plaintiff's undisputed proof, the terrain was so rough and precipitous on the west side of the railroad, that it would have been practically impossible for Sutton to have reached the track (in the night time) at or in the vicinity of the place where his body was found by any other route than via Pittman's crossing.

The theory pressed by the learned and able attorney for plaintiff in his brief is "that plaintiff's decedent was on the railroad track vomiting when a northbound train hit him, and that train knocked his body about fifteen feet going north, where the body scooped the ballast between the rails and again knocked the body further north, where the bone was driven into the cross tie, and then that train, or other trains dragged the body a distance of about 125 feet, completely and horribly mangling it."

The undisputed testimony of the son of the deceased is that the railroad to Pittman's crossing was not only the usual route by which the deceased walked to his home from Anderson depot, but that the same route "was used as a passage way for people walking;" that "everybody living up on this side (the west side) of the railroad" used it.

There is no evidence that the deceased, Sutton (rather than some other pedestrian), vomited at the point where the witnesses saw vomit on the railroad track, other than an inference from the fact that Sutton's body was found on the track 115 feet north of that point, and there were physical evidences at intervals along the track that his body had been dragged from a point 15 feet north of the vomit to the place where the body was found.

It would be contrary to well-established rules of evidence to infer from the presence of the vomit at the point indicated, that Sutton vomited there and was struck by defendant's train while standing or sitting at that point. An inference cannot be based on another inference.

"It is a well-established rule that a presumption can be legally indulged only when the facts from which the presumption arises are proved by direct evidence, and that one presumption cannot be deduced from another. To hold that a fact inferred or presumed at once becomes an established fact, for the purpose of serving as a base for a further inference or presumption, would be to spin out the chain of presumption into the regions of the barest conjecture." Shockley v. Produce & Ice Co., 158 Tenn. 148, 161, 11 S. W. (2d) 900, 904; Acc. East Tennessee Railroad Co. v. Lindamood, 111 Tenn. 457, 473, 78 S. W. 99.

·Moreover, the undisputed testimony of plaintiff's witness Will Curtis shows that "his (deceased's) shoes" were on the railroad track south of the vomit. Then why attribute more significance to the vomit than to the shoes?

█   We are of the opinion that the verdict in this case depends upon surmise, speculation, and conjecture. No witness in the record saw Sutton on defendant's railroad at any place alive after he and Bradford left the railroad at Pittman's crossing before 6:00 o'clock in the afternoon of July 23d. The fact that some one was calling "Barney" in the vicinity of the place where Jesse Curtis had last seen the deceased about 6:00 o'clock p. m. affords a basis for speculation as to whether he (Sutton) was not in communication and association with some person or persons at and after 8:00 o'clock on the night of July 23d.

The fact that he was a man who "drank whisky whenever he could get it" and was drinking in the afternoon of July 23d, but had consumed and given away his supply of whisky, together with the fact that he sent his wife's shoes to her by Jesse Curtis, rather than carry them home himself, suggests that he may have gone in search of more whisky. But, if he voluntarily returned to the railroad track, why did he leave his hat at or near the point on the road to his home where Jesse Curtis left him about 6 o'clock p. m.?

Pursuing the above-suggested line of conjecture, we quote from the brief of the learned counsel of defendant as follows:

"On the theory that one guess is as good as another, we offer the following surmises, equally if not more consistent with the facts proven as the theory on which the verdict and judgment were based.

"The deceased was at the station at Anderson when train No. 92 stopped for five minutes, at about 11:15 P. M. Thinking that the train would not gain enough momentum to prevent him from getting off at or near the Pittman crossing, a distance of 1,700 feet, he boarded some part of the train, and fell or was·thrown underneath, at the point where the ballast between the ties was scooped out.

"The deceased came in contact with the person or persons heard by Mrs. Willis and Mr. Pittman at eight and nine o'clock and was killed in a difficulty or affray. The person or persons responsible for his death carried his body to the railroad and threw it ·underneath a passing train, in order to conceal and cover up the felony.

"These surmises do not exhaust the realm of speculation. They are enough to demonstrate the fallacy of an inference that the deceased was walking down the track in front of a train which ran him down, in the absence of any evidence that the man was ever on the track alive, after he was last seen 100 yards away, and on the path leading to his home in a direction opposite from the railroad."

In reply to the suggestions above quoted from defendant's brief, learned counsel for plaintiff, in his brief, says:

46

"It is said by defendant that several plausible theories can be advanced which would not be inconsistent with the facts in this case:

"(a) That the Deceased was killed in a drunken affray and his body planted on the track. This theory wholly fails to take into consideration the vomit which was found on the track;

"(b) 'That he wandered down the roadway to the station and undertook to ride Train No. 92 to the Pittman crossing and was thrown under the train in an effort to get off.' If that theory was correct the vomit on the track would not all have been deposited at one place between two ties, but would have been a great distance up and down the track:

"(c) 'That he attempted to board a train.' Under that theory also the vomit would have been scattered up and down the track and not in one place.

"(d) 'That he stepped in front of a train to cross too close to the engine to be seen by the men on the engine looking ahead.' Under that theory the vomit would have been scattered up and down the track."

It is seen that the predicate of plaintiff's reply to the conjectural theories offered by defendant is the presence of vomit on the track, which, for the reasons hereinbefore pointed out, cannot be made the basis of an inference that Sutton was an obstruction on the railroad track at that point.

We think the record presents a series of probabilities as to the manner in which Jim Sutton was killed, and a case should not be left to a jury simply on a question of probabilities. Virginia, etc., Railway Co. v. Hawk (C. C. A.) 160 F. 348-352.

A verdict cannot be based on speculation, surmise, or conjecture. Chicago, etc., Railroad Co. v. Coogan, 271 U. S. 472, 46 S. Ct. 564, 70 L. Ed. 1041, 1045; De Glopper v. Railway & Light Co., 123 Tenn. 633, 648, 134 S. W. 609, 33 L. R. A. (N. S.) 913; Moore on Facts, vol. 1, sec. 596, p. 596; Buckeye Cotton Oil Co. v. Campagna, 146 Tenn. 389, 242 S. W. 646.

"The act which caused the injury and the negligence of defendant in relation to the act" cannot "be inferred from the accident itself." De Glopper v. Railway & Light Co., supra, 123 Tenn. 633, at page 648, 134 S. W. 609, 612, 33 L. R. A. (N. S.) 913.

It results that defendant's assignments of error are sustained, the judgment of the circuit court is reversed, the verdict is set aside, and the plaintiff's suit is dismissed.

The costs of the cause, including the costs of the appeal, will be adjudged against the plaintiff administrator.

DeWitt, J., concurs.

Crownover, J., dissents for the reasons stated in his opinion attached hereto.

Crownover, Judge (dissenting).

In this case, I am compelled to dissent. I think there are many circumstances proven sufficient to carry the case to the jury. The last person who saw the deceased while alive says he was sober; hence, he was in his right mind and had his normal senses.

"There is a presumption arising out of the instinct of self-preservation that a decedent was in the exercise of ordinary care when fatally injured, prevailing until overcome by competent evidence, and which may prevail where there are no eye-witnesses of or any direct testimony as to his conduct." Tennessee Cent. Railroad Co. v. Herb, 134 Tenn. 397, 183, S. W. 1011; Tennessee Cent. Railroad v. Dial, 16 Tenn. App. 646, 65 S. W. (2d) 610.

There is a presumption that the deceased exercised ordinary care for his own protection. 45 C. J. 1155-1162; 22 C. J. 94, 95; 20 R. C. L. 199; 1 Jones on Evid. (2d Ed.) 421, 422, sec. 257. He was killed by the train, and the facts will not admit of a theory that he boarded the train at the station or that he wandered off the bluff into the side of the train, as his shoes were found some distance up the track. There is no evidence that the train knocked his shoes off, and he didn't have time to pull them off while on the train.

The natural inference from the facts proven is that he went down on the track, pulled off his shoes, and was struck by a passing train. Several trains evidently passed over his body and no trainmen saw him; and the inspectors of the engines saw no evidence of a collision; hence, I think that no reasonable theory can be entertained other than that he was an obstruction on the track when killed. There is no evidence that remotely points to the theory that he was killed and put on the track; hence, I think there was sufficient evidence for the case to be submitted to the jury.

### On Petition for Rehearing.

FAW, P. J.

In the circuit court the plaintiff Ulis Sutton, as administrator of Jim Sutton, deceased, recovered a judgment, on the verdict of a jury, for $2,000 and costs, and the defendant railway appealed in error to this court, where, on a former day, the assignments of error were sustained, the judgment of the circuit court was reversed, the verdict of the jury was set aside, and the plaintiff's suit was dismissed at his cost. (The opinion was rendered by a majority of this court—Judge Crownover dissenting.)

In due season, the plaintiff filed a petition for a rehearing in which it is asserted that the decision of this court was based on "certain erroneous conclusions of fact" stated in the opinion filed. These alleged erroneous conclusions of fact are set forth in five numbered specifications in the petition to rehear.

The first statement in the opinion which the petitioner thus questions is that "Arms Spring" at which the deceased, Jim Sutton, appeared about 4:30 o'clock in the afternoon of July 23, 1935, is "in the vicinity of the station at Anderson."

The undisputed proof shows that Sam Arms Spring is "in a couple of miles of Anderson." It does not follow that it is not in the "vicinity" of Anderson. The word "vicinity" is a relative term, and there is nothing erroneous or inaccurate in referring to a spring or a home situated two miles from a railroad station as being in the vicinity of such station.

The second statement which the petitioner says is erroneous is contained in an excerpt from the opinion of the majority of this court, which excerpt is as follows:

"After remaining at Arms Spring for a half hour or a little more on the occasion above mentioned, Sutton and the witness Henry Bradford left there together and walked north on the railroad track from Anderson Depot, passing the place where Sutton's body was later found, to a private road crossing over the railroad track, known as Pittman's Crossing, approximately 1,950 feet north of Anderson Depot, where they walked west and southwest along Pittman's private road for approximately 300 feet to a gate near Pittman's house, which opened into a public road, described in the record as an 'unimproved wagon road.' "

Petitioner says, by way of criticism of the excerpt last quoted, that "Jim Sutton and Bradford were not down at Anderson, they did not travel north from Anderson towards Sherwood, and they did not pass the place where Sutton's body was later found," but that when they left Sam Arms Spring they walked down the highway a short distance towards Anderson, then got on the railroad north of Pittman's Crossing and walked the railroad, going towards Anderson, to Pittman's Crossing, where they left the railroad.

After a re-examination and careful analysis of the evidence, we think the latter criticism of our findings is just; that is to say, Sutton and Bradford, in reaching Pittman's Crossing during the afternoon of July 23rd, did not walk "north on the railroad track from Anderson Depot, passing the place where Sutton's body was later found," but walked south on the highway from Arms Spring for a distance not definitely shown in the record, and then got on the railroad track north of Pittman's Crossing and walked south on the railroad track to Pittman's Crossing, where they left the railroad.

We may say, however, that there is evidence (which evidently misled this court on our former hearing) from the witnesses upon whom petitioner relies, from which evidence it could be reasonably inferred that Sutton and Bradford went south on the highway from Arms Spring to Anderson and thence north on the railroad track to Pittman's Crossing. Sam Arms says that when Sutton and Bradford left his (Arms) Spring, they were "not on the railroad," but "going down the highway in the general direction of Anderson." Henry Bradford states that he first met up with Sutton at Sam Arms Spring and was with him "from Mr. Sam Arms Spring down to the tool house there at Anderson, or above the tool house." These statements of Arms and Bradford indicate that Sutton and Bradford walked south on the highway to or near the tool house at Anderson and then got on the railroad track and walked north to Pittman's Crossing; and we so found in our former opinion. But petitioner calls attention to Bradford's statement elsewhere in his testimony that when he and Sutton left Arms Spring they "went down the highway a little distance, then got on the railroad,—it was nearer, you know, the way we were going—we got on the railroad and went down to Mr. Forrest Pittman's Crossing."

We now find, as contended by petitioner, that Sutton and Bradford did not walk north on the railroad from Anderson to Pittman's Crossing, but that they walked south on the railroad track to Pittman's Crossing. In order to reconcile this conclusion with Bradford's statement that he was with Sutton from Arms Spring "down to the tool house at Anderson, or above the tool house," it is necessary to assume that when Bradford said "or above the tool house," he referred to the place on the side of the mountain where he left Sutton at the "fork" of the paths.

The third criticism of our findings is that the conclusions of fact stated in an excerpt from our opinion are erroneous, which excerpt is as follows:

"The record affords no suggestion of an explanation of the return of the deceased to the railroad track after he traveled over his usual route along the railroad track, passing the place where his body was later found, to Pittman's crossing and thence to the junction of the Bradford path with the path leading to his (Sutton's) home, where Bradford and Jesse Curtis left him."

As we have hereinbefore pointed out, the finding that "he (Sutton) traveled over his usual route along the railroad track, passing the place where his body was later found," is erroneous; but, with these words elided, we think the record sustains the remainder of the excerpt quoted in the third specification of the petition, supra, and the excerpt thus quoted is correct in so far as it states that "the record affords no suggestion of an explanation of the return of the

deceased to the railroad track after he traveled . . . to Pittman's Crossing and thence to the junction of the Bradford path with the path leading to his (Sutton's) home, where Bradford and Jesse Curtis left him.''

█ Through his remaining specifications (the fourth and fifth) the petitioner challenges as erroneous the statements in an excerpt from the majority opinion of this court as follows:

''His only practical route to reach the railroad track from the point where Jesse Curtis left him was to retrace his steps to the Pittman crossing. However, according to the plaintiff's undisputed proof, the terrain was so rough and precipitous on the west side of the railroad, that it would have been practically impossible for Sutton to have reached the track (in the night time) at or in the vicinity of the place where his body was found by any other route than via Pittman's crossing.''

Upon a re-examination of the record, we have found no evidence which would justify us in retracting or modifying the statements made in the excerpts from our opinion which are challenged by petitioner's fourth and fifth specifications, supra. We must take the record as we find it, and without ''the additional advantage'' enjoyed by the learned and able counsel for plaintiff, ''of having been upon the actual scene of the accident, and of having personally examined the lay of the land.''

█ The correction of our erroneous finding that Sutton and Bradford walked north on the railroad track from Anderson Depot to Pittman's Crossing, passing the place where Sutton's body was later found, does not remove from the field of surmise, speculation, and conjecture the finding of the jury that Sutton appeared as an obstruction upon the track in front of the train and was, in that manner, struck by the train and killed.

One aspect of the petition for a rehearing rather tends to emphasize the thought that the verdict is based on speculation and conjecture; and that is the contrast between petitioner's theory in the brief filed in support of his petition to rehear, and his theory in his former brief and argument.

In plaintiff's former brief, the presence of human vomit on the railroad track was the main fact upon which plaintiff predicated his contention that his intestate was an obstruction on the track in front of the train. He said: ''No reasonable mind could arrive at any conclusion except the fact that plaintiff's decedent was on the railroad track vomiting when a northbound train hit him, etc.'' Later, in the same brief, he repeated, in substance, the same theory, and added: ''Plaintiff insists no other reasonable theory could be advanced.''

In plaintiff's brief in support of his petition to rehear it is said that, from the fact that deceased's shoes were on the track, ''we can

indulge in the inference, or reasonable presumption, that deceased was removing his shoes and the train struck him while he was so doing and while he was an obstruction on the track. To attempt to explain the matter in any other way would lead us into the realm of the wildest imaginations and the most unreasonable and unnatural conclusions of the facts which are established in this case.''

We do not wish to be understood as saying that consistency in the matter of inferences to be drawn from proven facts must be maintained by parties and their counsel at their peril in all stages of a case. The point we have in mind is that when counsel of the recognized learning in the law, and well-known skill and ability as a practitioner as the attorney for the plaintiff in the instant case, so radically alters his views with respect to which particular facts in evidence afford inferences that the deceased was an obstru.tion on the track in front of the train, it suggests the probability of a conclusion based on surmise, speculation, and conjecture.

This opinion will operate as a correction of the finding of our former opinion in the one particular hereinbefore pointed out as erroneous; but in all other respects the petition for a rehearing is denied and dismissed, at the cost of the petitioner.

DeWitt, J., concurs.

Crownover, J., dissents for the reasons stated in his former dissenting opinion.