Reba Falster, Petitioner,

*v.*

The Travelers Insurance Company, Respondent.

390 S.W.2d 673.

(*Nashville,* December Term, 1964.)

Opinion filed March 4, 1965.

Petition for Rehearing Denied May 7, 1965.

Second Petition for Rehearing Denied June 2, 1965.

138

GLASGOW & ADAMS, S. McP. GLASGOW, JR., RICHARD D. TAYLOR, Nashville, for respondent, Travelers Ins. Co.

JOSEPH L. LACKEY, CHARLES GALBREATH, Nashville, for petitioner, Reba Falster.

MR. JUSTICE HOLMES delivered the opinion of the Court.

This suit seeks a recovery under the double indemnity provision of a policy of insurance issued by the defendant, The Travelers Insurance Company, on the life of Victor M. Falster. The Insurance Company paid to the plaintiff, Reba Falster, the face amount of the policy, $10,000.00, and she has instituted this action seeking an additional $10,000.00 alleging that the insured's death resulted from accidental bodily injuries which were the direct and independent cause of death.

In the Trial Court, where the case was tried to a jury, there was a verdict for the plaintiff, Reba Falster, the named beneficiary in the policy, for $10,000.00 together with interest thereon. By the majority opinion of the Court of Appeals, that judgment was reversed and the suit was dismissed. We have granted certiorari, and the cause has been argued before this Court.

The majority of the Court of Appeals concluded that the Trial Judge committed error in not sustaining defendant's motion for directed verdict made at the end of all the evidence. While the testimony of the witnesses is in conflict as to certain of the circumstances surrounding the death of the insured, the following facts appear in the record without conflict:

In 1956, Victor Falster entered into a business arrangement with Emory White to distribute in Nashville heaters manufactured by Mr. White's company at Albertville, Alabama. Falster was 34 years of age, a married man with four children. White was 53 years of age. His wife was 28 years old. They had a small boy about six years old.

Shortly after this business arrangement was made, Falster and Mrs. White began having an affair. Mrs. White and Falster met at various places, love letters were exchanged between them, to the knowledge of the spouse of each of them. In the late fall of 1956, Mrs. White separated from her husband, stating that she and her child were going to her mother's in Birmingham. White later learned she was not at her mother's. Having become suspicious of the relationship between his wife and Falster, White employed a detective in Nashville to locate his wife and son. He came to Nashville, found that his wife and son were living in an upstairs apartment in a residence in that city.

Prior to the time he came to Nashville, he had found in his wife's effects love letters from Falster to her. While in Nashville, he contacted the plaintiff, Mrs. Falster, who met with White and his brother and gave White love letters, written by Mrs. White to Falster, which Mrs. Falster had found. In this conversation with Mrs. Falster, White's brother advised her that he and White and Mrs. White kept guns, and that if they ever needed one they would have one. In this connection, Mrs. Falster testified:

"Q. In other words, they told you 'We all carry guns, but we are not going to hurt him?'

"A. Yes."

This meeting between White, his brother and Mrs. Falster took place about three months before Falster's death on April 8, 1957. A few weeks after this meeting Mr. and Mrs. Falster had an argument about his relationship with Mrs. White and separated. Mrs. White had been frequently calling Mr. Falster on the phone at home. On occasions he would leave home following these calls. White took his son from Mrs. White's apartment in

Nashville and later took Mrs. White back to Albertville, Alabama, where they moved into a house trailer following a reconciliation.

Certain of the love letters between Mrs. White and Falster were introduced in evidence at the trial, at which time the following stipulation was entered into:

"* * * that if these letters prove to be competent, that both Mr. and Mrs. White and Mr. Falster knew all about the correspondence and knew all about the facts.

"THE COURT: You stipulate that they all knew about them.

"MR. LACKEY: If they are competent, if they are admissible. That they all knew about them, they had them in their possession, knew all about the facts and circumstances surrounding this affair. Will you stipulate that Mr. Glasgow?

"MR. GLASGOW: Certainly. That is all I wanted to prove."

On the morning of Sunday, March 24, 1957, Falster came to the trailer at Albertville, Alabama, in which the Whites were living, and asked to talk to White. Falster and White went out to Falster's automobile and had a conversation, which is described as follows by White:

"A. He said, Emory, if you will let me have Teana (Mrs. White) and Reggie (White's son), I will assure you I will take the best care of them in the world, and I looked at him and said—

"Q. You have to go ahead and say it.

"A. I said you low-down sneaking son of a bitch.

"And he said well, Emory, I didn't understand

that you felt that way. He said I won't make any more trouble for you.

I said you mean you won't interfere with my affairs, or you won't interfere with Teana's affairs, or Reggie's life.

And he said no, no more as long as you are living.

I said you mean that as a threat? He said no, I didn't mean it as a threat. He said I just mean I won't interfere as long as you are living.

And he wanted to shake hands, and I declined to to shake hands''.

White testified that he was armed while having this conversation with Falster in Falster's automobile and that later his wife told him that Falster was armed at that time. Mrs. White, testifying about six years later, did not remember telling White that Falster was armed.

As stated, when Mrs. White returned with her husband to Alabama, the Whites moved into a house trailer. While living in this trailer White shot at Mrs. White. She was a witness for the plaintiff in this case and testified she was sure that she told Falster of the fact White had shot at her. She further gave the following testimony:

''Q. Did he threaten on other occasions?

''A. I don't remember. He had become a violent person. He had threatened my mother and father— he had threatened to kill them.

''Q. He had even threatened to kill himself?

''A. Yes, he had threatened to kill himself many times.

''Q. Your best judgment would be you told Victor of that?

"A. Yes, I would say so.

"Q. Had you also been getting telephone calls from Victor?

"A. After I came back he couldn't call me and he made me promise to call him at least every other day and I called him."

Mrs. White testified she made these phone calls away from Albertville so the calls would not go through the local operator, that if she failed to call Falster he would come to Albertville to see her, that she met him there at least twice after March 24th, but that to her knowledge Mr. White did not know of these meetings.

Falster's distraught state of mind at this time over Mrs. White's failure to return to him is indicated by the concluding paragraph of his letter to her dated April 6, 1957, in which he stated:

"Out of fairness to my devotion and anxiety, please let me know how you are. Whatever your wishes are, you know I will do all I can to give you happiness. I want you because I love you. I need you because you have so much of me, and I of you.

All my love, all my life,
Victor"

Mr. White testified that, when Mrs. White received a letter dated April 5, 1957, signed by a business associate of Falster's she handed the letter to White "and kind of smiled about it." Among other things, this letter stated:

"I wish you would please call write or go to Victor. It is getting hard to keep his mind off you long enough for him to watch over his business."

On the morning of April 8, 1957, Mr. and Mrs. White went to Huntsville, Alabama, where Mrs. White placed a call to Falster in Nashville in a public phone booth, with Mr. White in the booth with her. Mr. White described this phone conversation from Huntsville, as follows:

> "A. Yes, and from a public booth, and I was in the booth with her. She made the call to Mr. Falster, and what I remember in particular, I was hearing both sides of it, I had the receiver tilted so I could hear it, and what I remember in particular was him saying you get Reggie and you all get in that Buick and come up here to Nashville and I will fix it where he can't do a thing about it

> At that point I took the phone myself and told him that he had told me just previously a couple of weeks that he wasn't going to interfere with my affairs, and I had tried to feel like he made that in good faith, and he denied it.

> He said what he said was he would not harm me in any way. My temper flared up and I snatched the phone back on the hook and broke the connection."

Falster had been urging Mrs. White to arrange for another meeting between him and White. Also, during this time, Falster was aware of White's fondness for guns.

As the Whites were on their way home from Huntsville on the morning of April 8, 1957, Mrs. White brought up the subject of Falster's request for a meeting. White agreed to have the meeting. He and Mrs. White drove to Guntersville, Alabama, and called Falster and arranged to meet him at Fayetteville, Tennessee. The

Whites then drove from Guntersville, Alabama, to Fayetteville, and Falster drove there from Nashville. Although Mrs. Falster testified Falster did not own a pistol, he came to this meeting with a pistol in the glove compartment of his car and a shotgun under the front seat of his car. White came to the meeting with a 22 target pistol hidden in a sack with a bottle of whiskey. From Fayetteville Falster, White, and Mrs. White rode in Falster's automobile out on a country road in a sparsely settled area and stopped. Falster was in the driver's seat, Mrs. White was in the middle, and White was seated on the right on the front seat. Falster had his back turned to the left front door of the car and was holding Mrs. White's left hand with his right hand. Mrs. White testified she had seen Falster's pistol in the glove compartment earlier while Mr. White was gone from the car to get a soft drink as a chaser for the whiskey. White testified he saw the pistol in Falster's glove compartment when the glove compartment was opened in his presence. White had taken a number of drinks from his bottle as the parties drove out into the country. He fixed drinks for Falster and Mrs. White when they stopped.

Mrs. White's version of what next transpired is that White got quiet and Falster said, in substance. "I hope we can work this out." With that statement, White reached into the sack between his feet and came up with his pistol firing. Both Falster and Mrs. White grabbed for the gun, but White continued shooting until the gun was empty, killing Falster.

White's version is that he knew Falster had the pistol in the glove compartment and the shotgun under the front seat, that he only shot Falster when Falster reached for the glove compartment. In his trial for murder in

Alabama, White was acquitted on a plea of self defense. Following the shooting, White drove Falster's car back to Fayetteville, where he let Mrs. White out and instructed her to drive the White's car to Albertville. White then drove Falster's car to Albertville with the body in it and the authorities were later notified there had been a homicide. The Alabama Sheriff testified that when he removed the shotgun from under the seat of Falster's car it was loaded. Also, the pistol was loaded when it was removed from the glove compartment.

When the meeting at Fayetteville was arranged on April 8, 1957, Falster knew that White was aware of the fact that Falster was trying to get Mrs. White and her son back to him in Nashville, despite his promise to leave them alone, for White had reminded him of that promise before slamming the phone down during the first telephone conversation that morning. He knew White's attitude as expressed by White in the conversation between these men two weeks earlier. Then White's strong words caused Falster to agree to leave Mrs. White and the boy alone, but his agreement meant nothing. He had been told of White's threats and of his shooting at Mrs. White. He also knew White's fondness for guns. If Falster didn't foresee that he was going to have an armed confrontation with an outraged husband, why did he load his car with firearms before departing for Fayetteville? Falster was the man pressing for the meeting to which he carried a pistol and a shotgun. In the light of the facts which had been brought home to him, can it be said he did not reasonably expect White to be armed? We think not.

The test of whether or not the injury or death in such a situation is accidental within the meaning of an

accident policy is stated in *Mutual Life Insurance Company of New York v. Distretti,* 159 Tenn. 138, 17 S.W.2d 11, as follows:

"If, however, he voluntarily and intentionally did a thing from which, as a reasonable man, he foresaw or should have foreseen that death or injury might result, such death or injury was not an accident. Unless reasonable men could reach different conclusions as to the probable result of Distretti's conduct on this occasion, there was no question for the jury." 159 Tenn. at 144, 17 S.W.2d at 12.

In the Distretti case, Distretti's store had been robbed. As the robbers were leaving the scene, Distretti grabbed his gun, ran to the porch of his store, and fired at them as they were starting their car to get away. The bandits returned the fire. One bullet struck Distretti and killed him. This Court, speaking through the late Chief Justice Green, held that as a matter of law Distretti foresaw or should have foreseen that death or injury might result from his voluntary and intentional act. Therefore, his death was not accidental within the double indemnity provision of an insurance policy.

The rule stated in the Distretti case has been approved and applied by this Court many times. See *McGuire v. Metropolitan Life Insurance Co.,* 164 Tenn. 32, 46 S.W.2d 53, *Winton v. Metropolitan Life Insurance Co.,* 174 Tenn. 252, 124 S.W.2d 712, *Baker v. National Life & Accident Insurance Co.,* 201 Tenn. 247, 298 S.W.2d 715.

In the Distretti case, the Court further stated:

"If a sound public policy demands that more liberal contracts of accident insurance be offered to our citizens, that is a matter for legislative attention. The

Legislature has heretofore enacted various statutes regulating the provisions to be inserted in fire policies, life policies, and other policies. We are dealing with a contract entered into between competent parties and we do not feel justified in construing the word '*accidental*' to include incidents that are plainly excluded under our previous decisions." 159 Tenn. at 145, 17 S.W.2d at 13.

To this date, there has been no legislation passed on this subject.

This meeting between the husband and the wife's lover was not regarded by either of them as a meeting between two so-called civilized persons to simply discuss the matter of the wife's affections. If Falster did not take the firearms which he carried to this meeting for the purpose of defending himself from a deadly attack by White, then he took the gun and pistol for use as offensive weapons on White. Certainly he foresaw gunplay as an incident of this confrontation. He sought the confrontation and intentionally and voluntarily participated therein. We conclude that, under the undisputed facts in this record, the majority of the Court of Appeals correctly dismissed the case.

By the first three assignments of error accompanying the petition for certiorari, it is asserted that the majority of the Court of Appeals committed error because there was only one assignment of error in that Court and this assignment of error complained of the action of the Trial Judge "in overruling defendant's motion for a directed verdict made at the conclusion of plaintiff's proof and at the conclusion of all the proof." By these assignments it is contended, since the motion for a new trial of the defendant complained only of the

action of the Trial Judge in overruling the motion for directed verdict at the end of all the proof, the one assignment of error embraced matter which was not included in the motion for a new trial. These assignments are without merit. It is well settled that the introduction of evidence by a defendant after the overruling of a motion for directed verdict at the end of the plaintiff's proof waives the motion. The denial or granting of a motion for directed verdict at the end of the plaintiff's proof is a matter which addresses itself to the discretion of the Trial Judge and is not a matter of right. These rules were ably discussed by Judge Felts, while a member of the Court of Appeals, in *Sadler v. Draper*, 46 Tenn. App. 1, 326 S.W.2d 148. The inclusion in the defendant's one assignment of error in the Court of Appeals of reference to the action of the Trial Judge in overruling the motion for directed verdict made at the end of the plaintiff's proof is pure surplusage and does not destroy the efficacy of that assignment of error to question the action of the Trial Judge in overruling the motion for directed verdict at the conclusion of all of the proof.

■ By the fourth assignment of error in this Court, it is stated:

"The majority of the Court of Appeals committed error in their holding that the martial (sic) facts in the case of *Falster v. Prudential Insurance Company* are substantially the same as in the case at Bar and in holding that the Prudential case is res judicata of the issues raised in the case at Bar and is controlling in the case at Bar."

In response to this assignment, it should be stated that the plaintiff, Reba Falster, had sued the Prudential Insurance Company under the double indemnity feature

of a policy on Victor Falster's life in that company. That suit was tried in the Chancery Court without the intervention of a jury. There, the Chancellor found the death of Victor Falster was not an accident within the meaning of the policy, and dismissed the suit. The Court of Appeals, speaking through the late Judge Hickerson, affirmed the Chancery Court.

Our reading of the majority opinion of the Court of Appeals in the present case does not lead us to the conclusion that the majority opinion treats the decision in *Falster v. Prudential Insurance Company* as being *res judicata*. Rather, that opinion is cited and quoted from as additional authority for the fact that, under the undisputed facts contained in the present record, Falster's death was not an accident within the meaning of the policy sued on. In support of this assignment of error, it is pointed out that Mrs. White did not testify in the Prudential case. In our view of the present case, whether Mrs. White's version of the facts surrounding Falster's death or Mr. White's version of those facts is true makes no difference. As we view this case, Falster voluntarily and intentionally did a thing from which as a reasonable man he foresaw or *should have foreseen* that death or injury might result, and, therefore, his death was not accidental within the double indemnity provision of the policy sued on. Of course, the decision of the Prudential case is not *res judicata* in the present case. The present defendant was not a party to that suit, or in privity with the defendant in that suit. The causes of action sued on in the respective suits are separate and distinct causes of action against different defendants. The defendant in this case would not have been bound by the judgment in the Prudential case had that judgment been favorable to the plaintiff. Neither party is bound by that judgment.

See *Boring v. Miller et al.,* 215 Tenn. 394, 386 S.W.2d 521 (Blount Law, opinion filed contemporaneously with this opinion) and the cases cited therein.

The fifth and last assignment of error in this Court is that the majority of the Court of Appeals "did not base their opinion solely upon evidence contained in the record of the proceedings made up in the case at Bar, but incorporated in their opinion facts out of the record".

This assignment is based upon the reference by the majority of the Court of Appeals to the facts appearing in the Prudential case, in which Mrs. White was not a witness.

Having reviewed the present case upon the evidence contained in the present record alone, we conclude that the Court of Appeals was correct in holding that the Trial Judge erred in failing to direct a verdict for the defendant at the conclusion of all of the proof. Therefore, the assignments of error are overruled and the judgment of the Court of Appeals is affirmed, including that Court's adjudication of the costs of the cause.

While it has no bearing on the legal questions presented, it is interesting to note what has happened to the parties involved in the tragic events which led to this litigation. About six years elapsed between the death of Falster and the trial of this case in the Circuit Court. The record shows Mrs. Falster following the death of her husband on April 8, 1957, married another man in the month of May 1957, and at the time of the trial was living in another state. Mrs. White obtained an uncontested divorce from Mr. White, and, at the time of the taking of her deposition, was married to another man and living far away from Albertville. Mr. White and the

White's son were living back at Albertville. In speaking of himself and his son, White stated, "I might add we don't know whether she is living or dead, and I might add we don't care, either of us."

### Opinion on Petition to Rehear

A very zealous and impassioned petition to rehear has been filed in this case in which it is argued that we weighed the evidence in arriving at the conclusions stated in our original opinion. In our original opinion we summarized the ucontraverted facts which appear in the record.

Furthermore, we pointed out that any differences between Mrs. White's version of the facts surrounding Falster's death and Mr. White's version of those facts in no way changed the undisputed testimony in the record which showed that Falster voluntarily and intentionally met with White when Falster was in possession of facts which would require a reasonable man to foresee that death or injury to Falster might result from such meeting. Therefore, his death was not accidental within the double indemnity provision of the policy sued on.

The petition to rehear and a supplemental brief in support of the petition to rehear are signed by only one of the attorneys of record for the petitioner. The supplemental brief in support of the petition to rehear concludes with an appeal to the attorneys for the defendant "to at least cite one case in which an appellate court has reversed a trial court who has approved the jury's verdict for failing to direct a verdict."

Since the attorney filing the petition to rehear appears to be unfamiliar with such cases, we call his attention to *Glassman v. Martin,* 196 Tenn. 595, 269 S.W.2d 908,

in which the writer of this opinion, when a Circuit Judge submitted a case to the jury and approved the verdict of the jury for the plaintiff when, as a matter of law, the evidence did not make an issue for the jury. The Supreme Court reversed and dismissed the case.

In order that it not be assumed that *Glassman v. Martin,* supra, is unique, we call attention to *Acme Box Co. v. Gregory,* 119 Tenn. 537, 106 S.W. 350; *Mobile & O. Railroad Co. v. Brownsville Livery & Live Stock Co.,* 123 Tenn. 298, 130 S.W. 788, *Louisville & N. Railroad Co. v. Ray,* 124 Tenn. 16, 134 S.W. 858, *Mayor and Aldermen of Knoxville v. Cain,* 128 Tenn. 250, 159 S.W. 1084, *Southern Ice Co. v. Black,* 136 Tenn. 391, 189 S.W. 861, *Prudential Ins. Co. of America v. Davis,* 18 Tenn.App. 413, 78 SW.2d 358, *Nashville, C. & St. L. Ry. v. Sutton,* 21 Tenn. App. 31, 104 S.W.2d 834, *Jefferson Standard Life Ins. Co. v. Omohundro,* 30 Tenn.App. 151, 204 S.W.2d 185.

We find no merit in the petition to rehear. It is denied.

BURNETT, CHIEF JUSTICE, and WHITE and DYER, JUSTICES, concur.

CHATTIN, JUSTICE, not participating.