## The Mutual Life Insurance Company of New York *v.* Cora Distretti.

*(Nashville.* December Term, 1928.)

Opinion filed May 27, 1929.

FITZHUGH & FITZHUGH, for plaintiff in error.

BATES, SHEA & FRAZER, for defendant in error.

MR. CHIEF JUSTICE GREEN delivered the opinion of the Court.

Louis Distretti was held up and robbed in his store near Memphis and later killed by armed bandits on December 4, 1926. He had two policies of insurance on his life, written by defendant company, aggregating $5000. These policies provided for double indemnity "upon receipt of due proof that such death resulted from bodily injury effected solely through external violent and accidental means and occurred within ninety days after such injury." The defendant admitted liability for the face of the policies and tendered that sum. It denied liability for double indemnity, contending that the death of the insured did not result through accidental means.

The trial judge was of opinion that the contention of defendant was well made and directed a verdict in its favor as to its liability for double indemnity. The Court of Appeals was of opinion that the question of accidental death should have been submitted to the jury, reversed the judgment below and remanded the case for a new trial. This court granted a writ of *certiorari* and the case has been argued here.

Distretti ran a store in the suburbs of Memphis. He and his family also lived in the same house. The place was located at the junction of the Pigeon Roost road and the Bama road. The house fronted on the Pigeon Roost

road and there was a porch in front of it reaching from the store to the highway. Just to the left of the store, from fifty to seventy-five feet distant, the Bama road ran into the Pigeon Roost road. The level of the Bama road was considerably below that of the Pigeon Roost road, four feet or more, and the former road ascended to the latter in a steep grade, beginning a few feet from the junction.

According to the testimony of Mrs. Distretti, she heard some disturbance in the storeroom and she entered the storeroom from the rear where the living quarters of the family were located. There is some confusion in her testimony as to how many bandits were in the storeroom, whether one or two. She was carrying her baby and one of the bandits made her return to the back room at the point of a pistol. She testified that they robbed the cash drawer of about $200. After she returned to the back room, she heard a number of shots. She then went around the house to the front and found Distretti lying on the front porch mortally wounded. The bandits had fled when she got around the house.

Two young boys, who were returning from a picture show, it being about nine o'clock at night, were introduced by the defendant. They testified that as they approached Distretti's place they saw a car parked in the Bama road headed toward the Pigeon Roost road; that two or three men were in the car or just getting in; that Distretti ran out on the porch in front of his store with a pistol and opened fire on this car or the men in it; that the men returned the fire and Distretti fell. The car then got in motion, according to the boys, ran into the Pigeon Roost road, turned to the left and disappeared. They said that the men in the car continued to fire their pistols as they

drove away on the Pigeon Roost road, and one of the boys said that Distretti fired into the air a time or two after he fell.

The car was afterwards located and examined and four bullet holes were found in the front part of the car, the bullets apparently having been fired into the car from the left-hand side. Distretti had only one wound. A bullet entered his neck and ranged rather downward into his chest. This wound produced his death.

It is argued that the downward range of the bullet in Distretti's body shows that the fatal shot was fired after the car had turned into the Pigeon Roost road, since the Bama road is below the level of Distretti's porch. That the bullet holes in the car show that Distretti did his shooting after the car made the turn and exposed its left side. That Distretti, if he did not fire until they were fleeing on the Pigeon Roost road, might reasonably have believed that the bandits, intent on their get-a-way, would not return his fire, or if they did, he would be in little danger from such fire from a moving car.

There is nothing, however, to show that the bullet holes in the car were even similar to holes that would have been made by bullets from Distretti's pistol. Two bullets lodged in the frame of the car and there was no comparison between those and bullets adapted to deceased's weapon. The car used by the robbers had been stolen by them. It must have been exposed to fire other than Distretti's. Only three shots were fired from his pistol, as examination disclosed, and there were four bullet holes in the car.

The inference, therefore, that Distretti did not fire on the bandits until they were in flight along the Pigeon Roost road cannot rest on proven facts. It must be based

on another inference, or rather an assumption, that the bullet holes in the car were made by bullets from Distretti's pistol. Such reasoning, of course, is inadmissible. Moreover, the first mentioned inference is opposed to the positive testimony of the boys, and the second mentioned inference is opposed to the conceded circumstance that only three shots were fired from Distretti's pistol.

It is possible that Distretti was killed by a shot fired by one of the bandits as they were fleeing on the Pigeon Roost road. The range of a bullet in a body, however, does not mean much unless we can be certain of the particular position of the body at the time it was struck.

The record thus discloses without legitimate controversy that Distretti was held up and his store robbed by bandits whom he knew to be armed. Before they got away, he armed himself, and ran out and opened fire on them. They were desperate men and had committed a felony of high degree. We do not see how any reasonable man could have supposed armed desperadoes of this character would submit to being shot at or detained and would refrain from using their own arms to protect themselves and to effect their escape. It seems to us that any reasonable man must have anticipated the great probability of the fatal result of Distretti's conduct on this occasion. We cannot accordingly see, in any view of the evidence, how his death could be regarded as accidental.

The law to be applied in cases like this is very well settled. Although injury be intentionally inflicted by another nevertheless if the injury was not naturally to be foreseen by the insured, it is an accidental injury within the meaning of a policy such as the one before us. *Insurance Company* v. *Bennett*, 90 Tenn., 256; *Union Casualty, etc., Co.* v. *Harroll*, 98 Tenn., 591.

144

The foregoing rule is often stated with the further qualification that the insured has been guilty of no misconduct and has made no assault on the person from whom he receives the injury. The cases are all collected in a note, 20 A. L. R., 1123.

In *Union Casualty, etc., Co.* v. *Harroll, supra,* the insured, according to some of the proof, was advancing in a threatening manner upon the man who shot him. The insured, however, was unarmed and supposed the other man was unarmed, and the court thought it was properly left to the jury to say whether the insured should reasonably have anticipated serious injury from his conduct under such circumstances.

It may be conceded in the case under consideration that Distretti was guilty of no misconduct—that he was within his rights in undertaking to halt these bandits by whom he had been robbed. If, however, he voluntarily and intentionally did a thing from which, as a reasonable man, he foresaw or should have foreseen that death or injury might result, such death or injury was not an accident. Unless reasonable men could reach different conclusions as to the probable result of Distretti's conduct on this occasion, there was no question for the jury. As heretofore stated, we do not see how any difference could arise among reasonable men in the premises and we think the trial judge propertly directed a verdict in favor of the defendant.

We are referred to the case of *Sackett* v. *Masonic Protective Association* (Neb.), 17 A. L. R., 188, in which it was held, where the insured voluntarily aided an officer in the pursuit of persons suspected of a recent burglary and was shot by such persons, that it was a question for the jury whether the insured had been guilty of "volun-

tary exposure to unnecessary danger'' within a prohibition of the policy. The court reasoned that the insured was performing his legal and moral duty in aiding in the apprehension of the burglars and that in the public interest men should not be deterred from the willing performance of such a duty by the fear that in so doing they would overstep the bounds of prudence and forfeit their rights under insurance contracts. It was said: ''The law regards such contracts as made with reference to the perils incident to the fulfillment by the insured of his obligation to assist in bringing criminals to justice. Such hazards do not come within the definition of 'unnecessary danger.' ''

It will be observed that the question which arose in *Sackett* v. *Masonic Protective Association,* is not the question before us. A hazard may be regarded as not unnecessary in the sense of that case, yet if death or bodily injury is reasonably and naturally to be anticipated as the consequence of voluntary exposure to such hazard then, under our decisions, death or bodily injury thereby occasioned is not ''effected solely through . . . accidental means.''

If a sound public policy demands that more liberal contracts of accident insurance be offered to our citizens, that is a matter for legislative attention. The Legislature has heretofore enacted various statutes regulating the provisions to be inserted in fire policies, life policies, and other policies. We are dealing with a contract entered into between competent parties and we do not feel justified in construing the word *accidental* to include incidents that are plainly excluded under our previous decisions.

 It should be said that we see in this case no emergency involving human life, either his own or the life of another, that confronted Distretti when he went out on the porch with his pistol, and we therefore leave out of consideration several authorities relied on by counsel for the beneficiary. Neither do we consider the war cases. They are not harmonious. Those holding that the representatives of a soldier killed in battle are entitled to recovery on an accident policy rest on peculiar facts.

It results that the judgment of the Court of Appeals must be reversed and this suit dismissed.