Nancy J. Martin

*v.*

Massachussetts Mutual Life Insurance Company.

463 S.W.2d 681.

(*Jackson*, April Term, 1970.)

Opinion filed January 4, 1971.

Petition for Rehearing Denied February 16, 1971.

W. C. RODGERS, Memphis, for appellee.

J. KIRBY RIFFEL, Memphis, for appellant.

CHATTIN and CRESON, JUSTICES, dissented.

MR. JUSTICE McCANLESS delivered the opinion of the Court.

Nancy J. Martin, the widow of Silas E. Martin, deceased, sued Massachusetts Mutual Life Insurance Company for $2,000.00 which she claimed to be due her for the alleged accidental death of her husband under the following language of a group policy:

"If, as a result of accidental bodily injury which occurs while an employee is insured for Personal Group Accidental Death and Dismemberment Insurance such employee suffers the loss of life, limb or sight, and if such loss occurs within ninety days following the date of the accident, Massachusetts Mutual upon receipt of due proof of such loss will pay to such employee, if living, otherwise as provided in the section entitled 'Beneficiary,' the benefit specified in the section below entitled 'Schedule of Losses and Benefits.' "

The company by its answer denied liability and the case was heard by the Chancellor on a stipulation of the facts and from his decree in favor of the complainant the defendant has appealed. The facts as stipulated by the parties are, as follows:

"Complainant and her former husband, Silas E. Martin, were married May 29, 1963, at Hernando, DeSoto County, Mississippi.

"After the first fifteen months of their marriage, following the birth of their son, William Edward Martin, the husband became very dictatorial, arbitrary and violent.

"He frequently, over a period of years, 'stomped', beat, kicked and abused the complainant, applying the most profane, vulgar, filthy and insulting epithets, imposing on complainant great fear and humiliation, on account of which she did seek third person and police protection on numerous occasions. On one occasion his brother, in response to complainant's screams, intervened and restrained him, after he had beaten, kicked, 'stomped', pulled out hands full of her hair and then tied her to a tree threatening to set fire

to her. This occurred in Haywood County, Tennessee, their old home, where the Sheriff arrested him and the County Court sentenced him to sixty (60) days in the workhouse.

"By reason of her great fear of him when angry, she never dared, physically or verbally, to resist his vicious assaults and abuse, until she shot him as hereafter explained.

"On Friday night, March 15, 1968, he came home at 12:00 P.M. drinking, kicked the bed on which complainant was sleeping, with her on it, over against the wall, jumped on complainant and violently assaulted and abused her physically, she escaping only by pretending to have to go to the bathroom to vomit, from which she slipped out the front door, naked, and ran around to the back door with him in pursuit; she reached the phone ahead of him in time to ask a telephone operator to send the police to the home. Then he caught her, threw her on the floor furnace, grilled her body by holding her on the floor furnace. Then he continued to abuse complainant until the telephone rang. Decedent answered the phone and was questioned by the police. He told the police that complainant was drunk and that they should disregard her call, as everything was now under control. Upon hanging up, he again assaulted complainant and three times made the threat to kill her if she had him 'locked up,' saying, '* * * even if I have to serve ten years, I mean it, god damn it, I'm gonna kill you when I get out.'

"He told the police on arrival that complainant was an epileptic, had had a 'fit', pulled out her hair, etc. They refused to arrest and take him in until she called

Judge Weinman, who persuaded them to arrest deceased and keep him the remainder of the night.

"He appeared at the home Monday morning, March 18, 1968, at 6:00 A.M., literally kicked complainant, who was asleep, out of the bed, while wearing his big, heavy, 'truck driver' boots, then beat her, all the while cursing her, and told her he had come to get his 'kids' and when they left she 'would be dead as a skunk when we walk out that door.'

"Deceased then went into the bathroom and continued his verbal abuse and repeated over and over his intention to kill complainant in the immediate future.

"Complainant, being greatly frightened for her life, because she was afraid he might do her further harm, happened to think of his small loaded pistol in a dresser drawer, which she got and put in her duster pocket; and, after a few minutes, hoping to try to reason with him, went to the bathroom door and tried to talk to him, when he shook a razor blade in her face and said,'* * * and when I get through I'm gonna cut that god dam big fat throat of yours wide open and take my kids to a decent house.'

"He then grabbed her by the left arm and shoulder and pulled her up close to him, lowered the razor blade to within a fraction of an inch of her throat, and said, 'Now, you can go call all the god damn cops and Judges in Memphis, but they won't get here * * *'

"Complainant, being convinced that he was going to kill her, and while standing only on her left foot, as he had pulled her so far into the bathroom that she was off balance and was holding her so tightly, she

pulled the pistol and shot him in the head twice, from which wounds he died some two weeks later.

"Approximately one year before his death, deceased brought home the pistol used by complainant, allowed the children to play with it, then some months later told complainant that he loaded it and placed it in complainant's drawer (the top drawer of the chest-of-drawers near the bed), telling complainant that 'We might need this sometime.' Each month thereafter in the course of cleaning the drawer, complainant would move the pistol and carefully replaced it in the drawer, as she was afraid of the gun.

"Complainant was indicted, tried for murder on a plea of self defense, and was acquitted of all charges in the Criminal Court."

The policy contained the following exclusion:

"The insurance provided hereunder does not cover any loss resulting from or caused directly wholly or partly, by * * * D. participation in or in consequence of having participated in the committing of a felony, or"

Two issues were presented to the Chancellor: (1) was the death of the insured accidental; (2) did the deceased lose his life while participating in or in consequence of having participated in the committing of a felony? The Chancellor found that the death was accidental and that the deceased was not killed by participating in or in consequence of participation in the committing of a felony.

Before the deceased was taken from the home on the night of March 15, 1968, he threatened to kill the com-

plainant if she had him locked up after his assault upon
her on the morning of March 18, 1968, she had removed
the pistol from the dresser drawer and concealed it upon
her person. When he returned home he threatened to cut
her throat and pulling her close to him lowered a razor
blade within a fraction of an inch of her throat where-
upon the complainant shot him. Under the facts stipu-
lated to say that the complainant was justified in taking
the life of the deceased was not to say that he knew or
should have known that she had armed herself with the
pistol and would use it in her self-defense. We are in
agreement with the Chancellor who found that this was
not so and decided the case under the authority of *Union
Casualty, Etc. Co. v. Harroll,* 98 Tenn. 591, 40 S.W. 1080,
in which the Court said:

"A voluntary act is an intentional one, one which the
actor of his own will, with the power of choice, de-
termines to do or perform. So this condition is to be
read as the equivalent of one exempting the insurer
from liability where death results from an intentional
exposure of one's self to unnecessary danger. Both
terms imply some degree of knowledge or apprehen-
sion of the danger incurred, and a purpose to take the
risk. If the danger be concealed, and unknown to the
party who ultimately suffers from it, then it cannot
be said he has voluntarily exposed himself to it."

In each of the following cases the death of the de-
ceased was determined not to have been accidental be-
cause in each instance he had voluntarily exposed
himself to the hazard that had resulted in his death;
*Mut. Life Ins. Co. v. Distretti,* 159 Tenn. 138, 17 S.W.2d
11; *McGuire v. Met. Life Ins. Co.,* 164 Tenn. 32, 46 S.W.
2d 53; *Winton v. Met. Life Ins. Co.,* 174 Tenn. 252, 124

S.W.2d 712; *Baker v. Nat. Life & Accident Ins. Co.*, 201 Tenn 247, 298 S.W.2d 714; and *Falster v. Travelers Ins. Co.*, 216 Tenn. 137, 390 S.W.2d 673.

The Chancellor in his memorandum opinion held:

"The facts in this case do not establish such a voluntary exposure to danger to indicate an awareness on the part of the deceased such as to hold his death to be other than an accident under the authorities in this State.

"It is next necessary to determine whether the death of the husband was the result of his participation in a felony.

"If the deceased was only guilty of an assault and battery upon his wife, he was committing a misdemeanor, (T.C.A. 89-602) [T.C.A. sec. 39-602]. The only felony he might have been guilty of was that of an assault with a deadly weapon, or an assault to commit a felony, in this case some degree of homicide. To conclude that he intended to carry out his threat to kill her, or that the razor blade was a deadly weapon would require no more speculation than to conclude that the Complainant only intended to threaten the deceased and the gun went off by accident. Nor, considering the quantum of proof necessary in a criminal case, would her plea of self-defense warrant a conclusion as to his actual intention or hers.

"Considering the fact that the burden is on the Defendant to establish this conclusion as a matter of proof, and further the fact that the contract was drawn by the Defendant, I find that the deceased was not engaged in a felony under the law of this State at the time of his death."

We agree with the reasoning and with the conclusions of the Chancellor and affirm the decree.

DYER, CHIEF JUSTICE, and ADAMS, SPECIAL JUSTICE, concur.

CHATTIN and CRESON, JUSTICES, dissent.

### OPINION ON PETITION TO REHEAR

The defendant insurance company has filed a petition to rehear in which it earnestly insists that we reconsider and recede from our opinion. The arguments in the petition to rehear are the same as those that were made in the defendant's brief.

We are of opinion that the Chancellor correctly decided the case. Accordingly we must overrule the petition to rehear.