Inez W. **NICHOLAS**, Plaintiff-Appellant,

v.

The **MUTUAL BENEFIT LIFE INSURANCE CO.**, Defendant-Appellee.

No. 71–1128.

United States Court of Appeals,
Sixth Circuit.

Dec. 1, 1971.

Robert M. Johnson, Memphis, Tenn., for plaintiff-appellant.

Edward P. A. Smith, Memphis, Tenn., for defendant-appellee; McDonald, Kuhn, Smith, Gandy, Miller & Tait, Memphis, Tenn., of counsel.

Before CELEBREZZE, BROOKS and MILLER, Circuit Judges.

WILLIAM E. MILLER, Circuit Judge.

In this diversity action we are required to consider a difficult and somewhat esoteric distinction, frequently articulated by the Tennessee courts, between "accidental means" and "accidental results" policies of insurance.

Plaintiff, Inez W. Nicholas, sued in the court below as the beneficiary of a policy of life insurance issued by defendant on the life of her son, Jerry Thomas Nicholas, to recover additional benefits under the policy if "the death of the insured resulted directly, and independently of all other causes, from accidental bodily injuries * * *." The insured died from self-inflicted gunshot wounds sustained on June 17, 1968.

The jury having returned a verdict for the defendant, plaintiff on appeal advances four issues, i. e., that the court erred in its charge to the jury in stating

an incorrect standard to be applied under Tennessee law to determine whether the policy provided the additional benefits sued for; that the court erred in denying plaintiff's special requests to be included in its charge to the jury; that the court committed reversible error in permitting defendant to impeach its own witness; and, finally, that error was committed in the court's denial of plaintiff's motion for a directed verdict.

The insured Jerry Thomas Nicholas, at the time of his death on June 17, 1968, resulting from a gunshot wound, was 27 years of age. His death was caused by a 38-caliber bullet that entered his head over his left eye. On the day of the shooting the insured had made a business trip with a coworker, Ronald E. Chambers, to Dyer, Tennessee. At the time of this trip Mrs. Chambers was baby-sitting at the insured's apartment in Memphis in the absence of Mrs. Nicholas. The insured and Chambers having returned to the apartment in the late afternoon, a general conversation took place between the insured, Chambers and Mrs. Chambers. Sometime during the conversation the subject of guns came up. The insured then went to his bedroom and came back with a Smith and Wesson 38-caliber revolver in a fast-draw shoulder holster. The insured removed all of the shells from the revolver and handed it to Chambers for his inspection. The revolver was then returned to the insured, at which time he placed one 38-caliber bullet in the revolver's cylinder. It appears that during the conversation the insured made some mention of the fact that he had heard about Russian roulette being played while he was in college. The insured then spun the cylinder of the revolver. pointing it toward his head, and made a statement to the effect that if he had pulled the trigger he would have been dead. He then spun the cylinder several times with the revolver resting in his lap, but pointing toward his head. While engaged in doing so, the revolver discharged inflicting the fatal wound. Chambers testified that there was nothing to make the revolver fire except the insured's hand. Chambers described the weapon as a 38 snub nose pistol or revolver. He stated that the bullets are placed in the chambers of the cylinder and that when the trigger is pulled the cylinder revolves and thus pulls the bullets consecutively into the firing chamber. By consecutively pulling the trigger all six bullets will be discharged, if the cylinder is fully loaded.

This defense witness, on direct examination, further testified as to what happened after the insured had placed the bullet in the cylinder and was spinning it while the revolver was resting in his lap with the barrel pointing toward the insured's head as follows:

Q   Where was the gun pointing?

A   He had the gun in his lap with the gun or barrel pointing toward his head.

Q   Did he make any statement when he pointed it toward his head?

A   He said if he had pulled the trigger he would have been dead.

Q   He said that if he had pulled the trigger he would have been dead?

A   Yes, sir.

Q   What did he do after that?

A   He put the gun back down and spun the cylinder again.

Q   Pointing it at his head?

A   Yes, sir.

Q   Did he pull the trigger then pointing it at his head?

A   Yes, sir.

Q   What happened then?

A   The gun discharged.

Q   Striking him where?

A   Above his left eye.

However, on cross-examination when this witness was asked: "Mr. Chambers, do you know whether he pulled the trigger or not?" He answered, "No, sir."

In Tennessee, at least as early as 1915 in the case of Stone v. Fidelity and Casualty Co., 133 Tenn. 672, 675, 182 S.W. 252, a distinction has been taken between "accidental means" and "accidental results" policies. In that case the

insured sustained a ruptured retina when he raised his hands suddenly. In holding that the loss was not caused by "accidental means" within the language of the policy and that only the result could be termed an accident, the court reasoned:

> The general rule is that an injury is not produced by accidental means, within the meaning of this policy, where the injury is the natural result of an act or acts in which the insured intentionally engages. A person may do certain acts the result of which produces unforeseen consequences resulting in what is termed an accident; yet it does not come within the terms of this contract. The policy does not insure against an injury that may be caused by a voluntary, natural, ordinary movement, executed exactly as was intended.

Numerous later cases have approved the same distinction in denying recovery under "accidental means" provisions. See, as typical examples, Scott v. Metropolitan Life Ins. Co., 169 Tenn. 351, 87 S.W.2d 1011 (1935) (death from sunstroke); Rollins v. Life and Casualty Ins. Co., 190 Tenn. 89, 228 S.W.2d 170 (1950) (death from intense heat of sun while insured was loading cross-ties); Provident Life & Accident Ins. Co. v. Wallace, 23 Tenn.App. 697, 137 S.W.2d 888 (1939) (hernia caused by pushing automobile which was in gear).

In the present case the court on the accident issue charged the jury:

> The disputed portion of the policy provides that Mrs. Nicholas must

prove "that the death of the insured resulted directly and independently of all other causes from accidental bodily injuries." The interpretations of this provision in other policies by the Courts in Tennessee have established the law of Tennessee to provide "if the insured voluntarily and intentionally did a thing from which, as a reasonable man, he foresaw or should have foreseen that death or injury might result, then such death or injury was not an accident within the meaning of the policy." [1]

The language of this charge in its definition of the term "accident" is taken practically verbatim from the opinion in Mutual Life Ins. Co. of New York v. Distretti, 159 Tenn. 138, 144, 17 S.W.2d 11 (1929). As the policies in *Distretti* provided double indemnity "[if] death resulted from bodily injury effected solely through external, violent and accidental means * * *.," plaintiff insists that the district judge was clearly in error in relying upon that case and in incorporating a portion of the court's opinion in his charge. The reasoning is that the trial judge failed to take into account that the policy in suit covers only "accidental results," not "accidental means," and in consequence that the court's charge even if appropriate in an "accidental means" case, applied an erroneous standard to a policy providing additional benefits where the "results" were accidental.

█ Conceding, as we must,[2] that Tennessee has definitely committed itself to the distinction which plaintiff insists upon—a distinction often difficult

---

1. As the defendant apparently did not insist upon any of the exclusions of the policy pertaining to attempted suicide or an intentionally inflicted wound, the only issue submitted to the jury was whether the death of the insured was from an accidental bodily injury within the meaning of the policy.

2. It is not for us, of course, to criticize the Tennessee rule but in a diversity case to discover what the rule is as determined by the courts of the state and to follow it. Erie Railroad Co. v. Tompkins, 304

U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Yet it is difficult to resist making some observations concerning the Tennessee rule. Not only has the application of the distinction here invoked led, in our opinion, to some rather bizarre results in the Tennessee decisions, but the distinction appears to be irreconcilable with the well-established doctrine in Tennessee that insurance policies if doubtful, ambiguous, or uncertain in meaning, are to be construed most strongly in favor of coverage.

to apply—we nevertheless conclude that the challenged portion of the court's charge was not inconsistent with Tennessee law. As the Supreme Court's recent opinion in Seeley v. Pilot Fire & Casualty Co., 222 Tenn. 33, 432 S.W.2d 58 (1968) makes abundantly clear, it is possible, depending upon the wording involved, to equate some policies with so-called "accidental means" policies although those specific terms are not employed. In *Seeley,* the policy under consideration covered death or bodily injury "caused by accident." It contained no reference to "means" or "accidental means." Yet the court treated the policy as in substance a "means" policy and, relying upon numerous Tennessee precedents in "means" cases, denied recovery where the insured jumped over the running board in getting into his car, from which activity he later developed a hernia. The court held that the jump was a voluntary act executed as intended unaccompanied by a slip or mishap and consequently that the "cause" (which

the court expressly equated with "means") of the injury was not accidental. Only the injury itself could be so regarded.

■ In our view the same reasoning applies to the policy before us. Admittedly it is not in the identical wording as the policy construed in *Seeley* but in substance it is the same. Fairly considered, the language of the present policy may be paraphrased to provide the additional benefits if "the death of the insured is caused by accident." Not only does the first paragraph of the additional benefit provision refer to "causes" [3] but the idea of "causation" is also emphasized by the exclusionary clause. Under the heading, "Risks Not Assumed," the policy provides: The insurance under this provision will not be payable (a) if death is caused *or contributed to* by one or more of  *  *  *." (Emphasis added). Then follows the enumeration of five exclusions. Subparagraph (b) under this same heading

3. Pertinent provisions of the policy are:
ADDITIONAL DEATH BENEFIT— This provision is a part of this policy and is issued in consideration of the payment of the premium payable on or before delivery as specified on page 1 or 2 of this policy and of the subsequent payment, concurrently with premiums for the basic policy, of the extra premiums so specified for this provision. It provides, subject to the terms of this provision, insurance payable at the death of the insured as part of the proceeds of this policy upon receipt of due proof that the death of the insured resulted directly and independently of all other causes, from accidental bodily injuries, and that such death occurred within 90 days after the date of the accident causing such injuries and at or before the end of the policy year to which coverage is provided under this provision as specified on page 1 or 2.

The amount of such insurance under this provision is as specified on page 1 or 2.
Risks Not Assumed. The insurance under this provision will not be payable
(a) if death is caused or contributed to by one or more of
  (1) suicide, or any attempt at suicide, while sane or insane;
  (2) intentional self-inflicted injury of any kind, while sane or insane;

  (3) war or any act of war, whether declared or undeclared;
  (4) the taking, inhaling, or absorbing of any drug, poison, gas, or fumes, whether voluntarily or otherwise; and
  (5) bodily or mental infirmity, disease, or infection other than a pyogenic infection occurring through and with an accidental cut or wound; or
(b) if the death of the insured occurs or results from injuries sustained while
  (1) the insured is a member of the armed forces of any country, whether or not it is at war, unless such injuries are sustained while the insured is off duty; or
  (2) the insured is flying, traveling, taking off, landing, ascending, or descending from or with any aircraft unless
(i) the insured is a passenger without duties to perform aboard or in connection with such aircraft; and
(ii) such aircraft is then being operated in scheduled commercial passenger transport service or is then being operated by a nongovernmental business entity to transport its personnel or guests in connection with its business and is piloted by a duly licensed individual.

also focuses on "causation" in providing for additional exclusions if the death of the insured *occurs or results* from injuries sustained while the insured is engaged in specified activities.

Since we view the policy in suit as essentially analogous to a "means" policy, Seeley v. Pilot Fire & Casualty Co., *supra*, it follows that the court below did not err in using the *Distretti* language as reflecting the correct Tennessee standard.[4] This conclusion is also dispositive of the plaintiff's contention that the court erred in refusing her special requests embodying various aspects of the "accidental means" doctrine as developed in Tennessee.

We have examined plaintiff's further contentions that the court erred in permitting defendant to impeach its own witness and in denying plaintiff's motion for a directed verdict and we find them to be without merit. The judgment of the district court is therefore

Affirmed.

---

4. Plaintiff suggests without amplification that even if the court below correctly applied "accidental means" law, the charge was nevertheless incorrect, incomplete and erroneous. While we believe that the charge might well have been more complete on the accident issue, we do not find that the charge, considered as a whole, was unfair or prejudicial to the plaintiff.