**Nancy Louise Evans HOBBS,
Plaintiff-Appellant,**

v.

**PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY,
Defendant-Appellee.**

Court of Appeals of Tennessee,
Eastern Section.

July 23, 1975.

Certiorari Denied by Supreme Court
Nov. 3, 1975.

Anna F. Hinds, of Stone & Hinds, Knoxville, for plaintiff-appellant.

Wheeler A. Rosenbalm, Knoxville, for defendant-appellee.

W. P. PURYEAR, Special Judge.

## OPINION

For the sake of convenience in writing this opinion we will refer to the parties as plaintiff and defendant as they were designated in the trial Court.

Plaintiff sued to recover an accidental death benefit of $24,000.00 under a certain group insurance policy issued by defendant and covering a group of participating employees of the State of Tennessee. Plaintiff's husband, Jess L. Hobbs, was a member of the group covered by such policy and plaintiff was designated as his beneficiary in the event of accidental death.

The insured, Jess L. Hobbs, died within approximately an hour after the automobile which he was driving crashed into the rear end of another automobile being operated by one Kenneth George McNutt while the McNutt automobile was stopped in the inside lane of Kingston Pike preparing to make a left turn on to Mabry Hood Road. Kingston Pike is a four-lane thoroughfare and the point where this collision occurred is in Knox County, Tennessee.

The case was tried before the Circuit Judge and a jury as a result of which trial the jury found in favor of defendant and the suit was dismissed. After a motion for new trial was filed and overruled, this appeal in error resulted.

■ The first assignment of error arises out of the sole ultimate issue submitted to the jury, that issue being whether or not the insured died as a result of bodily injuries *accidentally* sustained in the aforementioned collision, so as to be within the provision of the insurance policy.

In this assignment plaintiff insists the trial Judge incorrectly charged the jury as follows:

"Now what is an accident? Well, an accident is a happening that is not expected or foreseen or intended, *Webster's New World Dictionary.* More important than that, we have a definition in law of the State of Tennessee.

Members of the jury, you have heard all of the proof in this case and, of course, it is for you to say what the proof shows. But if you believe from a preponderance of the evidence that the deceased, Jess L. Hobbs, voluntarily and intentionally did a thing—as I just defined it to you awhile ago, such as driving the automobile on this occasion in a state of intoxication—resulting in an occurrence from which he suffered injuries and died, which a reasonable man would foresee or should have

foreseen that death or injury might result therefrom, if you conclude that, then under the law of the State of Tennessee in cases of this kind such death or injury was not an accident within the meaning of the law." (B. of E. pp. 111, 112)

This instruction was obviously included in the trial Judge's charge because of evidence in the record which showed that, at the time of the collision, Hobbs was driving his automobile while in a heavily intoxicated condition.

Shortly after Hobbs died a blood sample was taken from his body and tested in a toxicological laboratory to determine the concentration of alcohol. According to the result of this test the blood-alcohol level was found to be .40% and there is expert testimony in the record to the effect that a person with this level of alcohol in his blood is heavily intoxicated and incompetent to operate a motor vehicle.

There is also some expert testimony in the record to the effect that such a high level of alcohol in the blood could possibly cause death.

This instruction of which plaintiff complains, is an accurate statement of what has come to be known among lawyers and judges in this State as the *Distretti* rule, this rule having evolved from the case of *Mutual Life Insurance Company of New York v. Distretti* (1928), 159 Tenn. 138, 17 S.W.2d 11, and subsequently applied in several other Tennessee cases.

We can certainly assume that the danger of injury or death as result of operating a motor vehicle while intoxicated is a foreseeable one and the appellate courts of this State have repeatedly held that death is not caused by accidental means, within the meaning of an insurance policy, if it is a foreseeable result of a voluntary and unnecessary act or course of conduct of the insured. *Mutual Life Insurance v. Distretti, supra; Baker v. National Life and Accident Insurance Company* (1956), 201 Tenn. 247, 298 S.W.2d 715; *Falster v. Travelers Insurance Company* (1964), 216 Tenn. 137, 390 S.W.2d 673; *Nicholas v. Provident Life and*

*Accident Insurance Company* (1970), 61 Tenn.App. 633, 457 S.W.2d 536.

However, plaintiff insists that the *Distretti* rule does not apply to the instant case and cites *Miller v. American Casualty Company* (6 Cir., 1967), 377 F.2d 479, which was a suit for accidental death benefit under an insurance policy.

In that case the insured was killed as a result of operating his automobile at high speed and while he was under the influence of alcohol. The suit was tried in U. S. District Court for the Western District of Tennessee, Western Division, which trial resulted in judgment against the insurer. The insurer appealed and the Sixth Circuit Court of Appeals affirmed.

In a rather brief per curiam opinion the Sixth Circuit Court said:

"Appellant's second defense is more complicated. It is based upon the claim that Mr. Miller suffered no 'accidental bodily injury.' The reasoning on this issue starts with the fact that on autopsy, Miller was found to have .24 alcohol in his bloodstream at the time of death. This, of course, is well past the point of intoxication. Appellant argues that for Miller to have consumed enough alcohol to have the autopsy showing referred to, and then to have driven a car at high speed, was conduct which any reasonable man would know might lead to his death. From this appellant reasons that such a risk was outside the contemplation of the policy because the means of death (drinking and high speed driving) were voluntarily assumed.

Judge Brown disagreed with this defense and so do we. The policy could have excluded injuries due to drinking or intoxication on the part of the insured (See T.C.A. § 56–3309(11); § 56–3306(5)). It had no such exclusion. Doubtless such an exclusion would considerably affect the salability of appellant's insurance policies. We see no mandate in law or public policy for this court to imply such an exclusion when none such was agreed on by the parties when the insurance contract was signed." (Supra, p. 480)

It appears to us that the Sixth Circuit Court of Appeals did not give thorough consideration to *Mutual Life Insurance Company v. Distretti* and *Falster v. Travelers Insurance Company* and overlooked *Baker v. National Life and Accident Insurance Company* in arriving at its conclusions in the *Miller* case.

It is significant that *Nicholas v. Provident Life and Accident Insurance Company*, *supra*, was decided by the Middle Section of the Tennessee Court of Appeals and certiorari denied by the Supreme Court after *Miller* was decided by the Sixth Circuit Court of Appeals.

The *Distretti* rule has long been established in Tennessee jurisprudence and has not been overruled by our Supreme Court, therefore, we are bound by it and the rule is applicable to the instant case.

Plaintiff's counsel also argues that if death caused by the insured operating a motor vehicle while intoxicated was not accidental within the meaning of the policy, a specific exclusion to that effect should have been written into the contract of insurance. However, we think that from the Tennessee cases which are heretofore cited in this opinion, it is clear that death which results from such action on the part of an insured is not *accidental* and hence no exclusionary clause is necessary.

The first assignment of error is respectfully overruled.

■ In the first part of the second assignment plaintiff insists it was error for the trial Court to instruct the jury that the burden of proof was upon plaintiff "from beginning to the end of the trial" and argues that the death certificate, which was introduced in evidence, constitutes prima facie evidence of death resulting from accident and, hence, the burden of proof shifted to defendant to rebut this prima facie evidence.

Plaintiff relies upon T.C.A. Section 53–413, which provides that such death certificate "shall be prima facie evidence of the facts therein stated."

Under Part I(a) of the death certificate the immediate cause of death is shown as "unknown."

Part II of this certificate contains the following printed language: "Other significant conditions; conditions contributing to death but not related to cause given in Part I(a)". Under this language there appears the typewritten word "accident".

If this certificate is construed in a manner most favorable to the insured, we are of the opinion that it only shows the cause of death was unknown to the physician who signed it, namely, Doctor Fred M. Furr.

Moreover, it cannot be inferred that Doctor Furr used the word "accident" in this certificate in the technical sense that it is used for the purpose of determining whether the death under investigation was one which was to be considered for determination of liability or non-liability under the accidental death benefit clause of an insurance policy.

It is conceded by defendant that Hobbs was involved in a collision between two automobiles shortly before his death. Such collisions are usually referred to as "accidents" by non-lawyers.

Therefore, the word "accident" as it was used in the certificate does not constitute prima facie evidence that death was accidental within the meaning of the contract upon which this suit is predicated.

Even if the instruction was erroneous, and we do not think it was, it does not appear that it affected the result of trial.

Pursuant to our harmless error statute (T.C.A. 27–117) it has been held that no reversal should be granted on an error in the trial Court's charge to the jury unless it shall affirmatively appear that such error affected the result of trial.

■ In the latter part of this assignment plaintiff insists that the trial Court erroneously refused to charge certain special requests. This portion of the assignment fails to comply with Rule 12(d)4 of this Court since such requests are not set forth in the assignment itself or in any part of plaintiff's brief and argument.

We might add, however, that plaintiff's counsel makes reference in the assignment to certain pages in the bill of exceptions and we have examined the three requests appearing upon those pages of the bill of exceptions to which reference is made and we are of the opinion that it was not reversible error to refuse such requests.

Although some portions of these requests do contain accurate statements of the law, the first and third requests are not applicable to this case.

Also, the second request is not a completely accurate statement of the law applicable to this case. See *Morton v. Martin Aviation Corp.* (1959), 205 Tenn. 41, 325 S.W.2d 524; *Morris v. Bolling* (1948), 31 Tenn.App. 577, 218 S.W.2d 754; *Luckey v. Gowan* (1959), 46 Tenn.App. 392, 330 S.W.2d 45.

The second assignment of error is respectfully overruled.

■ In the third and last assignment plaintiff insists it was error for the trial Court to admit into evidence, over her objection, a toxicological report and testimony based thereon showing a blood-alcohol level of .40% in the body of insured.

Plaintiff's counsel argues that this evidence was not admissible because there is no evidence showing continuity of control over the blood sample from the time it was taken from the body until it was delivered to an analyst for examination and testing at the University of Tennessee Medical Research Laboratory.

We do not find any merit in this argument but even if it did have some merit in it, the plaintiff cannot rely upon this alleged error for reversal.

■ Appended to the death certificate introduced by plaintiff is a report which shows the blood-alcohol level in the insured's body to be .40%. This official record constituted competent evidence of the facts and matters therein contained and, therefore, any evidence of the blood analysis thereafter introduced without lay-ing proper predicate therefor would be harmless error.

However, with reference to this matter, evidence in the record is as follows:

The blood sample was taken upon written request of State Trooper Edward Brock, who was investigating the death of insured. Doctor Fred Carr removed the blood sample from insured's body and this was observed by Trooper Brock, who forthwith took the sample to the Clinical Laboratory at University of Tennessee Hospital.

Trooper Brock's testimony on this procedure is as follows:

"Q. After you filled out this request you observed Dr. Fred Carr take this blood sample, didn't you, Officer Brock?

A. Yes, sir.

Q. And he immediately handed it to you?

A. Yes, sir.

Q. In a container or vial that they take this in?

A. Yes, sir.

Q. And, consistent with the practice and procedure that you followed then, you went over to the UT Hospital Laboratory, didn't you?

A. Yes, sir.

Q. And you filled out over there a request for chemical analysis of this blood sample, didn't you, Officer?

A. Yes, sir.

Q. And that is a good, accurate copy of that request that I handed you there, isn't it?

A. Yes, sir.

Q. You filled out, so there won't be any misunderstanding, you filled out the top part above where it says 'For use of laboratory only'?

A. Yes, sir.

Q. I will ask you, Officer, to make that Exhibit Number Six to your testimony?

MR. SUMMERS: I object to this particular witness introducing this because it is not within his control. It is not a record that he controls.

MR. ROSENBALM: He has testified, Your Honor, that it is a true and correct copy of what he filled out.

THE COURT: Is that what you filled out, a copy of it; do you recognize it?

A. Yes, sir.

THE COURT: Exhibit Six

(EXHIBIT NUMBER SIX WAS MARKED AND FILED)

Q. Officer Brock, after you filled out that request marked as Exhibit Six you attached it to that blood sample that you left there at the laboratory at UT, didn't you?

A. Yes, sir.

Q. And you also marked on the blood sample container that this was a blood sample of the blood of Jess L. Hobbs?

A. No, sir, I just take that with the vial, or whatever you want to call it, tube, whatever you want to call it.

Q. So you attached Exhibit Number Six to the vial?

A. Yes, sir.

Q. I believe you indicated that this was the practice and procedure that the Tennessee Highway Patrol followed on that occasion?

A. Yes, sir, at that time." (B. of E. pp. 45, 46, 47)

On the morning following delivery of the sample to the laboratory Clayton Klemann, a toxicologist employed by the State of Tennessee at University of Tennessee Hospital, removed this sample from the refrigerator at the laboratory.

Mr. Klemann testified as follows:

"Q. Where did you obtain the blood sample that you made the analysis of?

A. The specimen and the request sheet were picked up in the clinical chemistry lab. at U. T. Hospital. It had been left there in the refrigerator of the clinical chemistry lab. the previous evening.

Q. When did it come into your possession?

A. At 8:00 o'clock in the morning on March 8, 1973.

Q. You mentioned that it was accompanied by something and what was that?

A. The analysis request form.

Q. Let me show you this document that has previously been introduced as Exhibit Number Six and ask you if that is the request for chemical analysis form that you are now referring to?

A. Yes, sir, it is.

Q. And it was with the blood alcohol sample?

A. Yes, sir.

Q. Did I ask you when you picked that up that morning, I believe on March 8, 1973?

A. Yes, it was 8:00 o'clock in the morning.

Q. And what disposition do you make of the blood sample at that time?

A. Could you rephrase the question, I don't quite understand? What was the results of the test?

Q. Yes, when did you make the test?

A. The test was performed the following day, March 9, 1973, at 10:10 in the morning.

Q. What did you do with the sample in the meantime?

A. It was stored in our refrigerator in the toxicology lab. It was refrigerated for the period of time that I didn't analyze it.

Q. Why did you do that?

A. To preserve the specimen, it is a biological specimen.

Q. And then you made your test I believe you said on March 9, 1973?

A. Yes, sir.

Q. What results did you obtain?

A. The results of the alcohol analysis was 0.40% ethyl alcohol." (B. of E. pp. 89–90)

In our opinion, this evidence laid a proper predicate for introduction of the toxicological report and testimony based thereon.

The third assignment of error is respectfully overruled.

All the assignments having been considered and overruled, the judgment of the trial Court is affirmed and costs of this appeal will be taxed against plaintiff and the sureties on her appeal bond.

SANDERS and GODDARD, JJ., concur.