**Randall E. PEDIGO, M.D., Plaintiff,**

v.

**UNUM LIFE INSURANCE COMPANY OF AMERICA, and Union Mutual Stock Life Insurance Company of America, Defendants.**

**No. 3:95–CV–0458.**

United States District Court, E.D. Tennessee, at Knoxville.

March 24, 1997.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JORDAN, District Judge.

This civil action involves a physician's claims for disability insurance benefits under two disability insurance policies issued by the defendants.[1] The court tried the action without a jury by agreement of the parties, and at the conclusion of the trial, took the case under advisement. The court agreed to defer deciding the case pending the Tennessee Supreme Court's issuance of an opinion in another, unrelated case which the plaintiff argued would have an impact on the ruling in this one. After the trial of this civil action, the plaintiff sought to supplement the record with an offer of excluded evidence.

There is no dispute between the parties that this civil action arises under the diversity jurisdiction, 28 U.S.C. § 1332, and the court so finds. There is no dispute that Tennessee law governs the substantive issues in the case. 28 U.S.C. § 1652. The court will state first its findings of fact based on the trial evidence, then address the plaintiff's posttrial motions, then state its conclusions of law.

### I

The plaintiff, Randall E. Pedigo, M.D., has been a physician since 1974. He was the Knox County, Tennessee Medical Examiner for many years. By the summer of 1994, he was involved in a controversy concerning whether he had abused his professional position for the purpose of engaging in nonconsensual sexual activities. On June 22, 1994, officers of the Knoxville, Tennessee Police Department and the Tennessee Bureau of Investigation came to Dr. Pedigo's residence to ask him to come with them for a police interview. As a result of the events on this date, Dr. Pedigo was seriously wounded by pistol bullets.

Dr. Pedigo was a collector of firearms, and an accomplished marksman. As a medical examiner, he was an auxiliary member of the Knoxville Police Department and the Knox

J.D. Lee, Lee, Lee and Lee, Jerry J. Phillips, University of Tennessee, College of Law, Knoxville, TN, for Plaintiff.

W. Kyle Carpenter, Tony R. Dalton, Woolf, McClane, Bright, Allen & Carpenter, Knoxville, TN, for Defendants.

---

1. The record indicates that the two named defendants are in fact one entity. The court will refer to the defendant in the singular throughout the rest of these findings and conclusions.

County, Tennessee Sheriff's Office. His knowledge of firearms and of police procedures far exceeded that of the average layperson. When Tennessee Bureau of Investigation Agent Stephen E. Richardson, who shot Dr. Pedigo, first encountered the plaintiff on June 22, 1994, Agent Richardson knew of Dr. Pedigo's reputation as a gun collector and a marksman.

Officer Dwight Loop of the Knoxville Police Department and Agent Richardson were two of the police officers who went to Dr. Pedigo's residence on June 22, 1994. When they first met Dr. Pedigo, according to Agent Richardson, the officers were in the process of applying for a warrant. Agent Richardson was concerned that Dr. Pedigo knew that he was under surveillance, and was concerned also that the plaintiff might destroy evidence in his residence. According to Agent Richardson, the officers decided to confront Dr. Pedigo in the parking lot of the plaintiff's residence when they were advised that Dr. Pedigo was "on the move" in a truck or van.

Dr. Pedigo knew on June 22, 1994, before his encounter with the police officers, that the acting chair of surgery at the University of Tennessee Medical Center had received media inquiries concerning the sexual misconduct charges against the plaintiff. Dr. Pedigo also knew that police might be searching for him. According to Officer Loop, when the officers first encountered Dr. Pedigo in his parking lot, the plaintiff was "real nervous." When confronted by the officers, Dr. Pedigo agreed to go "downtown" to be questioned. According to Agent Richardson, when this first encounter occurred, Dr. Pedigo reached into his motor vehicle, but the agent suspected there was a firearm in it, and reached in ahead of Dr. Pedigo. There was a shotgun in the plaintiff's vehicle, and so Agent Richardson instructed Dr. Pedigo to lock the doors to the plaintiff's vehicle, and to ride with another officer.[2] At this point, Dr. Pedigo was "insistent" that he needed to go into his residence to change clothes. The court credits Agent Richardson's testimony that when the officers advised Dr. Pedigo

that they expected to have a warrant soon, the plaintiff became more anxious.

Dr. Pedigo went into his residence, and officers followed him. Dr. Pedigo took his time, performing such tasks as brushing his teeth, combing his hair, checking doors to see whether they were locked, and checking a coffee pot. This activity caused Agent Richardson to believe that the plaintiff was stalling. At one point, Dr. Pedigo sat on a sofa to put on his shoes, and an officer noticed a holstered, snub-nosed revolver on the sofa, which the officer moved away from the plaintiff.

When Dr. Pedigo was finished with his preparations to leave with the officers, the group went to his front door. Dr. Pedigo had his key in hand, as if to lock the door behind him. Dr. Pedigo then rushed back through the door into his residence, and slammed the door behind him hard enough to overcome the resistance of one of the officers pushing against the door. Officer Loop ran to the back of the residence, fearing that Dr. Pedigo might try to escape. Agent Richardson broke through the front door.

It is undisputed that what happened next is that Agent Richardson shot Dr. Pedigo multiple times, and that Dr. Pedigo was holding a pistol when he was shot, but never fired a shot. There is otherwise a sharp conflict between the agent's and the plaintiff's testimony, however, for Dr. Pedigo says that he was standing with his back to the front door, either contemplating or ready to commit suicide. Agent Richardson says that Dr. Pedigo turned to face the agent and pointed his pistol at the agent, using what appeared to be a police (two-handed) grip.

The court finds Agent Richardson's testimony fully credible. The physical evidence is overwhelmingly in favor of his account. A dent in the trigger guard of Dr. Pedigo's pistol shows that the pistol was aimed at the shooting agent, not aimed up at the plaintiff's head. The police report shows that when the plaintiff's pistol was taken into custody, one round was in the chamber, the pistol was cocked, and the safety was off. This is con-

---

**2.** Dr. Pedigo denied at trial that he was instructed not to follow the officers in his own vehicle, but the court finds otherwise.

sistent with Agent Richardson's testimony that he heard the plaintiff either chambering a round in the semi-automatic pistol or cocking its trigger when the agent first saw the plaintiff's pistol. The plaintiff admitted in deposition testimony that his pistol was ready to fire when he was shot.

Cleland Blake, M.D., Tennessee Assistant Chief Medical Examiner, and a pathologist with a great deal of experience in gunshot wounds, described in detail how the results of his investigation of the case supported Agent Richardson's version of what happened. The plaintiff's wounds show that he was shot from in front of him, and that the paths followed by the first two bullets were horizontal to the plaintiff's hands. The physical evidence is consistent with the first or second shot rendering the plaintiff incapable of pulling the trigger with his right index (trigger) finger, but leaving both of the plaintiff's hands gripping the pistol while the plaintiff stood before or approached Agent Richardson. Some of the first shots turned the plaintiff's body, explaining the locations of subsequently inflicted wounds. The wound to Dr. Pedigo's head came late in the series of shots fired by the agent, explaining why Dr. Pedigo did not fall until after the agent had fired several rounds. It would have been physically impossible for the wounds to Dr. Pedigo's forearm to have been inflicted while Dr. Pedigo was standing with his back to the shooting agent with his arms at his sides, as claimed by the plaintiff. The court therefore finds that when Agent Richardson forced his way into the plaintiff's residence, the plaintiff ran around a corner; that when the agent next saw Dr. Pedigo, the plaintiff was bent over a recliner, with his hands in the cushion of the recliner; that Dr. Pedigo did not react to yelled commands to stop and to place his hands where they would be visible; that the plaintiff turned from the recliner and faced the agent while wielding a pistol; and that the agent fired shots at Dr. Pedigo until Dr. Pedigo was no longer facing or approaching him with pistol in hand.

Dr. Pedigo lost his right eye as a result of this incident. He is right-handed, and has no feeling in his right index finger. The parties stipulated that Dr. Pedigo is physically un-able to perform surgery (as opposed to practicing medicine generally) as a result of the shooting on June 22, 1994. At the time of trial, Dr. Pedigo was participating in the Tennessee Medical Foundation's Impaired Physician Program, and was not licensed to practice medicine anywhere in the United States.

Dr. Pedigo's license to practice medicine in Tennessee was revoked in 1995. This revocation was based on his conviction, pursuant to his guilty plea, of four counts of unlawfully dispensing a controlled substance and four counts of sexual battery. In deciding to revoke his professional license, the Tennessee Board of Medical Examiners found that these criminal convictions had a direct bearing on the plaintiff's ability to practice medicine, and that Dr. Pedigo had used his medical knowledge and his status as a physician in committing the felonies to which he had pleaded guilty.

Before the Board of Medical Examiners, Dr. Pedigo took the position that his offenses had occurred over a short period of time and had resulted from a combination of psychological factors in existence during that time period, that his psychological condition was amenable to treatment, and that he would ultimately be able to demonstrate his eligibility for reinstatement of his medical license. At his deposition, David T. Dodd, M.D., Medical Director of the Impaired Physician Program, testified that in his opinion, Dr. Pedigo is a candidate for reinstatement of his professional license in some form [doc. 69 at 8].

The disability insurance policies issued by the defendant on which the plaintiff's claims are based provide for benefits while the insured is totally disabled. Total disability for the purposes of these policies occurs when the insured is unable to perform the material and substantial duties of the occupation which is his regular occupation at the time disability commences, as a result of sickness or injury. There is no issue of sickness in this case. Injury is defined as accidental bodily injury in one policy, and as bodily harm caused by an accident in the other. One of these policies provides in its definition of "regular occupation" that if the insured engages primarily in a professionally recog-

328

nized specialty at the time of onset of a disability, his occupation is that specialty.

## II

After the trial, and after the Tennessee Supreme Court issued its decision in *Harrell v. Minnesota Mutual Life Insurance Company*, 937 S.W.2d 809 (Tenn.1996), the plaintiff filed his posttrial brief [doc. 73]. In this brief, the plaintiff also assailed two evidentiary rulings made by the court at trial, and moved for a new trial on the ground of these asserted errors. The plaintiff also filed a "motion for offer of proof" [doc. 74], offering into the record photographs taken of the plaintiff while he was being treated for his gunshot wounds and an "index" containing Dr. Pedigo's description of what is shown by each of these photographs. The defendant responded [doc. 78] in opposition to the offer of proof, noting that it came over two months after the pertinent evidentiary ruling.

■ Taking up the plaintiff's second motion first, Fed.R.Evid. 103(a)(2) contemplates an offer of proof contemporaneous or nearly contemporaneous with the pertinent evidentiary ruling. When the court delayed ruling in this case in anticipation of the Tennessee Supreme Court's ruling in *Harrell, supra*, it did not intend to leave the record open to allow counsel to seek to correct asserted errors in the trial or to relitigate factual or evidentiary issues. Without addressing whether the plaintiff disclosed enough of the substance of his excluded testimony at the time of the court's ruling to satisfy the rule's offer-of-proof requirement, the court will deny this motion to supplement the record.

■ The plaintiff's motion for a new trial, coming before the entry of judgment, is a nullity. Fed.R.Civ.P. 59. In any event, the motion is not well taken. The plaintiff's failure to disclose before trial that he would testify not only as a fact witness but as an expert stating terminal ballistics opinions based on his own gunshot wounds would have worked an unfair advantage against the defendant. *See* Fed.R.Civ.P. 26(a)(2)(A). Evidence that another disability insurer not sued in this civil action paid Dr. Pedigo's claim was not evidence of a subsequent remedial measure by a nonparty, *see* Fed.R.Evid. 407; it was irrelevant hearsay evidence of a nonparty's opinion concerning whether Dr. Pedigo became disabled due to an accident, and therefore properly excluded. Fed.R.Evid. 402 and 802.

## III

■ *Harrell, supra*, did not provide as much of a change in Tennessee law as the plaintiff says it did. In *Harrell*, the Tennessee Supreme Court dealt with an accidental death insurance policy which defined accidental death in terms of resulting, directly and independently of all other causes, from an accidental injury which was unintended, unexpected and unforeseen. The insured had died in a motor vehicle collision after becoming voluntarily intoxicated. The lower courts, following *Mutual Life Insurance Company of New York v. Distretti*, 159 Tenn. 138, 17 S.W.2d 11 (1929), had held that the insured had not died from accidental means. In *Distretti*, the insured had died from gunshot wounds after chasing armed bandits with a weapon. The Tennessee Supreme Court in *Harrell* overruled *Distretti* and abolished the earlier ruling's distinction between accidental means and accidental result.

*Harrell* teaches that the meaning of "accident" in an insurance policy should be derived from plain policy language and the ordinary understanding and reasonable expectations of the average policyholder, not from the tort-law doctrine of foreseeability. Under this more modern analysis, the unexpected result of behavior which is voluntary can nonetheless be an accident for insurance coverage purposes. The Tennessee Supreme Court stated the modern rule as follows: "[I]f death [or injury] is the unanticipated and unexpected result of an intentional, voluntary act, it is accidental in the ordinary and plain sense of the word and recovery is available under an accidental death [or disability] policy." 937 S.W.2d at 814.

The court's focus, then, must be on whether Dr. Pedigo's disabling wounds were unanticipated and unexpected. They were not. Much of the plaintiff's argument rests on his version of the events of June 22, 1994, which the court has not accepted. Furthermore,

much of his argument rests on irrelevant facts. For example, whether Dr. Pedigo was charged with a criminal offense for having aimed a weapon at Agent Richardson has no relevance to the issues in this civil action. It is true that Dr. Pedigo had a right to possess licensed firearms in his home, and perhaps even true that Dr. Pedigo, knowing that there was not yet a warrant outstanding for his arrest, was surprised when Agent Richardson broke through the locked front door and followed the plaintiff back into his residence. The plaintiff could not, however, in any ordinary, reasonable sense, have been surprised when his pointing of a pistol at Agent Richardson in the tension-filled circumstances of this case provoked a potentially lethal response.[3]

Dr. Pedigo, unlike the deceased insured in *Harrell,* did not merely engage in behavior such as drinking too much alcohol which sometimes leads to unfortunate results and sometimes does not. Instead, he aimed a pistol at an armed law enforcement officer, and so voluntarily and intentionally reduced the possible outcomes of the confrontation to two: shooting the officer or being shot. Dr. Pedigo's injuries therefore cannot be said to have resulted from an accident in any sensible meaning of the word. As the defendant noted in its posttrial brief [doc. 77], courts in other jurisdictions which have addressed similar factual situations and policy language have come to the same conclusion. *Roque v. Nationwide Mutual Insurance Company,* 502 Pa. 615, 467 A.2d 1128 (1983); *Krulls v. Hartford Accident and Indemnity Company,* 144 A.D.2d 744, 535 N.Y.S.2d 157 (1988); *Sanders v. Prudential Insurance Company of America,* 697 S.W.2d 80 (Tex.App.—Fort Worth 1985, writ dism'd w.o.j.).

The court's conclusion renders it unnecessary to address the defendant's arguments that public policy prohibits payment of the plaintiff's claims in this case, and that the plaintiff is disabled from practicing medicine because of the revocation of his license for having dispensed controlled substances and having committed sexual battery, not be-

cause of his physical injuries. The court rejects, for the reasons stated, the plaintiff's argument that he is disabled within the meaning of these policies by reason of a combination of psychological factors which he and the medical director of the Tennessee Medical Foundation Impaired Physician Program anticipate might not disable him in the future. The plaintiff is disabled as a result of the gunshot wounds which he suffered, and he did not suffer them as a result of an accident.

---

3. Evidence in this record shows that police procedure in this region permits the use of lethal force when an officer is in danger or when necessary to save others in danger. The evidence also shows that Dr. Pedigo, as an auxiliary member of the Knoxville Police Department and of the Knox County Sheriff's Office, was aware of this policy.